**UNITED STATES of America**

**v.**

**Ohan KARAGOZIAN.**

**Crim. No. H–89–9 (JAC).**

United States District Court,
D. Connecticut.

June 21, 1989.

Peter D. Markle, Asst. U.S. Atty., New Haven, Conn., for U.S.

Robert I. Kalina, New York City, for Ohan Karagozian.

## RULING ON PENDING MOTIONS

JOSÉ A. CABRANES, District Judge:

The defendant is charged with one count of possession of cocaine with intent to distribute and one count of conspiracy to do so. He moves to suppress all evidence seized from his person and his home following his warrantless arrest, and he separately moves to suppress all evidence and fruits thereof seized from a storage facility in Northborough, Massachusetts the day after his arrest (notwithstanding the existence of a warrant to search that storage facility signed by Judge Paul F. LoConto of the District Court Department of the Trial Court of Massachusetts). An evidentiary hearing on these motions took place on May 30, June 6, and June 9, 1989.[1] Pursuant to Fed.R.Crim.P. 12(e), the court enters the following findings of fact and conclusions of law.

### I.

On January 11, 1989 Trooper Jeffrey Hotsky of the Connecticut State Police, acting in an undercover capacity, purchased one ounce of cocaine from Eric Pepin.[2] Previously, a confidential informant had told members of the State Police and agents of the Drug Enforcement Administration ("DEA") that Pepin was a major cocaine distributor in Connecticut and that Ohan Karagozian, the defendant, was his source for the cocaine. The agents and police officers did not, however, know the specific details about the relationship between Pepin and Karagozian, and at no point while Trooper Hotsky was undercover did Pepin tell him anything about Karagozian or about Pepin's supply of cocaine. Sometime after the one ounce purchase of cocaine, Trooper Hotsky arranged for a January 13, 1989 purchase of eight ounces of cocaine from Pepin.

On January 13, a Friday, Special Agent John Bryfonski of the DEA, and a number of other agents and police officers, observed Pepin drive into the parking lot of a McDonald's Restaurant in Brooklyn, Connecticut. Karagozian, who was in a car with an antenna for an automobile telephone, also drove into the parking lot.[3] Special Agent Bryfonski then saw Karagozian drive into a shopping center across the street, Pepin go to a pay telephone, Karagozian drive back to the McDonald's parking lot, and Pepin and Karagozian separately enter the McDonald's restaurant,

---

**1.** Even though I allowed evidence to be presented regarding both motions, I do not mean to intimate that, with respect to the search of the storage facility (a search made pursuant to a warrant), the defendant made the substantial preliminary showing necessary to mandate an evidentiary hearing under *Franks v. Delaware,* 438 U.S. 154, 170–72, 98 S.Ct. 2674, 2683–84, 57 L.Ed.2d 667 (1978). Rather, since an evidentiary hearing was already required concerning the warrantless arrest of defendant and subsequent warrantless search of his house, and since the same witnesses appeared to be involved in both the search of defendant's house and the search of the storage facility, judicial economy suggested allowing the hearing to encompass both motions, thus avoiding the question of whether the substantial preliminary showing had been made. After three days of evidentiary hearing, however, I am not sure that my decision was one that favored judicial economy.

**2.** Eric Pepin was indicted as a codefendant of Ohan Karagozian. He pleaded guilty on April 19, 1989 to one count of possession of cocaine with intent to distribute.

**3.** Although Special Agent Bryfonski did not know what Karagozian looked like, Special Agent David Aldridge, who was also in the parking lot, identified Karagozian to Special Agent Bryfonski by radio.

where they stayed for ten to fifteen minutes.

After leaving the restaurant Pepin and Karagozian returned to their respective cars and drove out of the parking lot, with Karagozian behind Pepin. The agents and police officers followed. Special Agent Bryfonski observed both cars drive down Allenhill Road, a rural area. Both cars pulled over to approximately the same spot at the side of the road. Pepin got out of his car and went into Karagozian's car, where he stayed three to five minutes. Pepin then went back to his own car, and both cars continued down Allenhill Road. The agents and police officers followed Pepin, who drove directly to the place where the prearranged sale of eight ounces of cocaine to Trooper Hotsky was to take place. At some point while following Pepin, the agents and police officers lost surveillance of Karagozian. There is no evidence that Karagozian ever knew he was being observed by law enforcement authorities.

At the prearranged meeting place, Pepin delivered eight ounces of cocaine to Trooper Hotsky, and Pepin was then arrested. The arrest occurred at approximately 3:00 p.m. At this point, prior to hearing any statements of Pepin regarding the charges against him, Special Agent Bryfonski, accompanied by Special Agent Aldridge and one or two State Police officers, went to Karagozian's house in Moosup, Connecticut. It is undisputed that Special Agent Bryfonski's purpose in going to Karagozian's house was to arrest Karagozian, if he could be located.

The agents and police officers arrived at Karagozian's house at some time before 4:00 p.m., and they parked in Karagozian's driveway. Special Agent Bryfonski then walked up some stairs located at the side of the house, which led to a raised wooden deck behind the house. A sliding glass door at the rear of the house opened onto this deck.[4] Karagozian came to the sliding glass door, and Special Agent Bryfonski identified himself. Special Agent Bryfonski asked Karagozian to come outside;

Karagozian asked why, and Special Agent Bryfonski told him he would rather talk to him outside. Karagozian then walked out onto the wooden deck. It is undisputed that, at least by the time Karagozian was on the deck and one or two steps away from the sliding glass door, he was under arrest. It is also undisputed that no force or deception was used to bring Karagozian from inside the sliding glass door to outside it.

Karagozian and Special Agent Bryfonski went to the driveway and then into a police car. Meanwhile, Special Agent Aldridge entered Karagozian's house through the sliding glass door, with his gun drawn. Karagozian was informed of his rights and was told what the police had seen him do that day with Pepin. When Karagozian did not agree to cooperate and give a statement, he was asked to get out of the car, where he was told he was under arrest, handcuffed, returned to the police car, and again informed of his rights. He was then asked if he would consent to a search of his home and his car. Special Agent Bryfonski told him he could refuse to consent, but Special Agent Bryfonski added that if he did not consent the agents and police officers would apply for a search warrant. Karagozian indicated that the agents and police officers could conduct a search. Karagozian understood what the agents and police officers were asking of him, and he was not under the influence of alcohol or drugs.

Karagozian was then brought back inside his house and handcuffed to a chair. While handcuffed he was asked to sign a DEA "Consent to Search" form, which he read and signed at 4:18 p.m.; Trooper Hotsky arrived at Karagozian's house at approximately this time. Karagozian does not dispute that he understood the contents of the form. Nevertheless, he now asserts, quite plausibly, that he felt "intimidated" by the number of police officers at his house and their conduct, and he felt some-

---

**4.** There is no evidence suggesting that this raised deck, being in the rear of the house, was a natural place for a visitor to go or was in any way an area readily accessible to visitors.

thing was "being done wrong."[5]

After the search began, Karagozian's wife left the house and consulted with an attorney, B. Paul Kaplan. She then returned to the house and advised her husband to stop the search. At this point Karagozian requested that the agents and police officers stop the search, which they did at 4:43 p.m. The agents and police officers left the house with Karagozian and the items they had seized up to the time they stopped the search, and they went to the State Police station in Plainfield, Connecticut.

Upon arriving at the State Police station, Special Agent Bryfonski learned that Pepin had been cooperating with the police and had made detailed statements. Among other things, Pepin had stated that Karagozian had told him of keeping cocaine in a storage facility in Massachusetts. Pepin did not know the precise location of the storage facility, but knew it was near a certain camera shop in Northborough, Massachusetts, because on December 20, 1988 Karagozian had dropped him off at the camera shop and returned some ten minutes later with cocaine.

Special Agent Bryfonski, the other agents and police officers, and Pepin then went to Massachusetts. The only storage facility they located near the camera shop identified by Pepin was the Space Station Storage facility in Northborough. The manager of the storage facility arrived, and they learned from him that Karagozian did indeed maintain a storage space there and that someone had entered that storage space on December 20, 1988 and on January 13, 1989.

Massachusetts State Police Trooper Thomas Duffy, on the basis of information given him primarily by Special Agent Bryfonski, applied for and obtained a warrant to search Karagozian's storage space from Judge Paul F. LoConto of the District Court Department of the Trial Court of Massachusetts. A search of the storage space took place at approximately 5:45 a.m.

on January 14, 1989. The manager of the storage facility was present at the time. Entry to the storage space was gained by a key taken from Karagozian's jacket during the search of Karagozian's home. The evidence indicates, however, that the agents and police officers could have gained access to the storage space even without Karagozian's key.

## II.

Special Agent Bryfonski did not have an arrest warrant when he arrested Ohan Karagozian. As an agent of the DEA, however, he was empowered to "make arrests without warrant ... for any felony ... if he has probable cause to believe that the person to be arrested has committed or is committing a felony." 21 U.S.C. § 878(a)(3)(B). Probable cause to arrest is to be determined from the "totality of the circumstances" and exists when the facts and circumstances within the officer's knowledge, and those of which he has reasonably trustworthy information, are sufficient in themselves to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested. *United States v. Giagoudakis*, 693 F.Supp. 1417, 1419 (E.D.N.Y.1987), *aff'd*, 856 F.2d 480 (2d Cir. 1988) (per curiam); *see also, Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983); *Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979).

■ Defense counsel conceded at oral argument that, at the time Special Agent Bryfonski arrested Karagozian, probable cause to arrest existed. In any event, I find that in the "totality of the circumstances" presented here, and, in particular, in light of the information provided by the confidential informant as corroborated by the January 11 cocaine sale by Pepin, the January 13 clandestine meeting between Karagozian and Pepin at the McDonald's Restaurant and on Allenhill Road, and the cocaine sale by Pepin that occurred immedi-

---

**5.** Although much else to which Karagozian testified may be of doubtful credibility, this segment of his testimony can be, and is, credited.

ately after that clandestine meeting, probable cause existed to arrest Karagozian.

The existence of probable cause to arrest Karagozian does not, however, automatically mean that the arrest of Karagozian satisfied the requirements of the Fourth Amendment. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). According to *Payton*, "[t]hese same basic principles of Fourth Amendment law apply with equal force in the context of warrantless entries in the home made for the purposes of arrest, *even where there is independent probable cause for such an arrest.*" *United States v. Zabare*, 871 F.2d 282 (2d Cir.1989) (emphasis added). Thus, absent "exigent circumstances," an arrest may not be made without a warrant inside the arrestee's home regardless of whether probable cause exists. *See id.; see also Welsh v. Wisconsin*, 466 U.S. 740, 749–50, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984).

The government contends that the warrant requirement of *Payton* does not apply to this case because Karagozian was not arrested inside his house, but outside it, on the rear deck and a crucial step or two from the sliding glass door. According to the government, as long as Special Agent Bryfonski did not cross the threshold of the sliding glass door, he met the requisites of *Payton*. Although the government's position would clearly be correct if the door at issue divided a defendant's apartment or hotel room from a common hallway, *see United States v. Barrios–Moriera*, 872 F.2d 12, 14 (2d Cir.1989); *United States v. Holland*, 755 F.2d 253 (2d Cir.), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2657, 86 L.Ed.2d 274 (1985), this door divided the interior of Karagozian's house and the rear deck.[6] "Although the Supreme Court held in *Payton v. New York* that the Fourth Amendment prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest, it has not yet delineated the degree of Fourth Amendment protection afforded the curtilage, as opposed to the home itself." *Krause v. Penny*, 837 F.2d 595, 596–97 (2d Cir.1988). The government has not brought to my attention any cases applying the *Payton* doctrine to a situation such as this one.

Assuming, without deciding, that Karagozian was not arrested until the time he was on the deck and one or two steps away from the sliding glass door, I nevertheless conclude that the Fourth Amendment requires a warrant for such an arrest. In the first place, the deck was not an area in which Karagozian had merely "the customary easement of way in the common hallway," *Holland*, 755 F.2d at 254, but rather an area of which he was the fee simple owner and had the right to exclude others. But far more important than any property concepts, *see Holland*, 755 F.2d at 257–60 (Newman, J., dissenting), is the reasonable expectation of privacy that Karagozian had regarding his rear deck. While "there is substantial lower court authority for the proposition that *areas such as driveways that are readily accessible to visitors* are not entitled to the same degree of Fourth Amendment protection as are the interiors of defendants' houses," *Krause*, 837 F.2d at 597 (emphasis added), the rear deck, being at the rear of the house, was not a place, like a driveway, with ready access to visitors. Furthermore, being in the rear of the house, it was not an area generally visible to members of the public. I conclude that the doctrine of *Payton* applies to an arrest made on the rear deck of the Karagozian home. Accordingly, the arrest of Karagozian, even though made with probable cause, was presumptively unreasonable.[7]

---

6. A private rear deck, unlike the common hallway in an apartment building or hotel, is a place from which the owner has the right to exclude anyone, and in which therefore the owner would not expect to see anyone he had not invited.

7. Because of the holding today, it is unnecessary for me to decide the precise moment at which Karagozian was arrested, and particularly whether the arrest occurred while Karagozian was inside the sliding glass door or outside it.

In order to justify the presumptively unreasonable warrantless arrest of Karagozian, the government has the burden of proving "exigent circumstances." *Zabare,* 871 F.2d at 289; *see also Welsh,* 466 U.S. at 750, 104 S.Ct. at 2097. The government has argued that exigent circumstances existed once Pepin was arrested, contending that Karagozian would have expected to hear from Pepin following the completion of the eight ounce sale of cocaine. According to the government, Pepin's failure to contact Karagozian would increase the risk that Karagozian would flee or destroy potentially incriminating evidence.

■ The determination of "exigent circumstances" turns upon whether, in light of all the facts and circumstances of the particular case, there was an "urgent need" that justified a warrantless entry. *Zabare,* 871 F.2d at 290; *see also United States v. Martinez-Gonzalez,* 686 F.2d 93, 100 (2d Cir.1982). In this case the government has not met its burden of showing that exigent circumstances sufficient to justify the failure to obtain a warrant for the arrest of Karagozian existed. Karagozian did not know that Pepin had been arrested. There is nothing in the record to suggest that any of the agents or police officers were aware of any practice or routine between Karagozian and Pepin whereby Pepin would contact Karagozian within an hour or two of any cocaine sale by Pepin. Thus, it is purely speculative to suggest, much less conclude, that the arrest of Pepin created an "urgent need" to arrest Karagozian without a warrant. Moreover, any risk of flight could have been minimized by having one or two agents or police officers watch Karagozian's home while the others went to obtain an arrest warrant, and if Karagozian were to leave his house he could have been arrested without the warrant. Finally, the agents and police officers had no information other than speculation to suggest that Karagozian had any incriminating evidence in his house that he might imminently destroy. *Cf. Zabare,* 871 F.2d at 290 (member of conspiracy to distribute counterfeit tickets had taken possession of tickets marked "void" on their face); *United States v. Cattouse,* 846 F.2d 144, 147 (2d Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 316, 102 L.Ed.2d 335 (1988) (person arrested was known to have "marked buy money").[8]

Because Karagozian was arrested without a warrant in violation of *Payton* and because there were no exigent circumstances justifying the arrest, the arrest violated the Fourth Amendment, and all evidence obtained as a result of the arrest, including statements of Karagozian, must be suppressed. The government challenges such a result, contending that the result of this "technical" violation is merely a benefit to defendant and a deterrent to an essential police investigatory tool, the questioning of people in their homes. The right at issue in this case, however, is far from technical—it is at the very core of the Fourth Amendment, established in the proposition that "[t]he right of the people to be secure in their … houses … shall not be violated." Absent exigent circumstances, a person in his own home is to be free of unwanted governmental intrusion without a warrant. *See Payton,* 445 U.S. at 589–90, 100 S.Ct. at 1381–82. The police can still question people in their homes. In the absence of exigent circumstances, what they cannot do without a warrant is arrest people in their homes, even if they have probable cause to arrest.

### III.

The next question to consider is precisely what constitutes evidence obtained as a result of the arrest of Karagozian. Karagozian apparently did not make any statements after his arrest that the government will seek to introduce at trial. The evidence at issue in defendant's motion is instead physical evidence seized from Karagozian's home following his arrest. The

---

**8.** I also note that any argument about the risk to Trooper Hotsky in his undercover capacity constituting an exigent circumstance, *see Zabare,* 871 F.2d at 290–91, would be unavailing, because the arrest of Pepin presumably ended any undercover role, and any arguable risk, for Trooper Hotsky.

government argues that this search was valid because Karagozian consented to the search. Any consent was sufficient to authorize the search, however, only if events after the unconstitutional arrest sufficiently attenuated its taint. *United States v. Ceballos*, 812 F.2d 42, 49–50 (2d Cir.1987); *see also Dunaway*, 442 U.S. at 217, 99 S.Ct. at 2259; *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975). The government "bears the burden of proving a break in the causal chain." *Ceballos*, 812 F.2d at 50; *see also Brown*, 422 U.S. at 604, 95 S.Ct. at 2262.

■ In this case I cannot find that the government has met its burden. Although after the illegal arrest Special Agent Bryfonski informed Karagozian of his rights and explained to him the meaning of his consent to search, that consent was given within, at most, a few minutes of the illegal arrest. Nothing intervened to purge the taint of the illegal arrest. In fact, when Karagozian gave his consent (a time after Special Agent Aldridge had entered his house with gun drawn) he felt "intimidated" and believed that something was "being done wrong." What had been "done wrong" was that Karagozian's right to be secure in his house had been violated, and now agents were asking to further intrude upon that security. Moreover, when an intervening event in the chain of causation between arrest and search did occur, the return of Karagozian's wife with advice from Attorney Kaplan, Karagozian stopped the search. In sum, "[t]he consents to search ... were too closely connected in context and time to the illegal arrest to break the chain of illegality." *Ceballos*, 812 F.2d at 41. Accordingly, the physical evidence seized from Karagozian's home on January 13 must be suppressed as the product of an illegal arrest.

### IV.

■ I turn now to the motion to suppress all evidence and fruits thereof from the search of the storage facility in Northborough, Massachusetts, which was authorized by a search warrant signed by Judge Paul F. LoConto of the District Court Department of the Trial Court of Massachusetts. A threshold question is whether federal or Massachusetts law governs the determination of this motion. Defendant asserts that, since the search was done in Massachusetts upon a warrant issued by a Massachusetts Trial Court judge, the propriety of the issuance of this warrant is governed by Massachusetts law. Nevertheless, since federal law applies to a motion to suppress evidence even if the evidence was solely the product of an investigation by Vermont authorities, *United States v. Pforzheimer*, 826 F.2d 200, 204 (2d Cir.1987), federal law certainly applies to a consideration of the propriety of this search warrant, which was obtained by the joint effort of Massachusetts, Connecticut, and federal agents and officers.

■ Under federal standards, I find, upon a review of the language of Trooper Duffy's affidavit for the search warrant and in the totality of the circumstances presented, that the Massachusetts state judge had a "substantial basis" for concluding that probable cause existed to issue the warrant. *See Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332. Trooper Duffy's affidavit stated generally that Karagozian and Pepin had a meeting just before Pepin was arrested selling cocaine to Trooper Hotsky, that Pepin said that Karagozian was his source of supply, that Pepin said that Karagozian kept his cocaine in a storage facility near a Northborough camera shop, and that Karagozian did in fact maintain a storage space at the Space Station Storage facility in Northborough. This information is sufficient in and of itself to justify the issuance of the search warrant. The existence of a storage space maintained by Karagozian and the observations of the agents and police officers of the meeting between Pepin and Karagozian corroborated the information from Pepin.

Even setting aside the statements in Trooper Duffy's affidavit that were obtained on account of the illegal arrest and the subsequent search of Karagozian's house, and furthermore setting aside the statements in the affidavit that have been alleged to be false, the affidavit still sup-

ports the issuance of the search warrant. The allegations that Karagozian had been being investigated for the "past month," that Karagozian had been taken into custody, that Karagozian entered his storage space on specific dates (rather than that some unknown person entered the storage space), that a key had been seized from Karagozian which matched the lock on Karagozian's storage space, and that "drug related documents" and $7,500 in cash had been seized from Karagozian's residence, can all be set to one side and sufficient content in the warrant affidavit will still remain to support a finding of probable cause. *See Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 2684–85, 57 L.Ed.2d 667 (1978). In such a situation the inaccuracies are irrelevant. *Id.* at 172 n. 8, 98 S.Ct. at 2684 n. 8. Items seized pursuant to the warrant cannot be suppressed.

In any event, there is no evidence in this record even suggesting that any statements made by Trooper Duffy in the affidavit, or that anything Trooper Duffy was told by Special Agent Bryfonski or by anyone else on which he relied in making the affidavit, were deliberate falsehoods or were made with reckless disregard for the truth. *See Franks*, 438 U.S. at 171, 98 S.Ct. at 2684. Rather, the full record of this case reveals an honest and committed effort by the agents and police officers involved to satisfy the requirements for the Massachusetts search warrant in a diligent and legitimate manner.

 Finally, it should be observed that the search of the Massachusetts storage facility was not a fruit of the illegal arrest and the subsequent search of Karagozian's house. The information obtained from Pepin was sufficient to lead the agents and police officers to the storage facility; in fact, plans to travel to Massachusetts and try to locate this storage facility had been made even before Special Agent Bryfonski arrived at the police station with Karagozian. Although the key by which the lock on the storage space was opened was seized during the search of Karagozian's home, I have no difficulty finding that the police could have obtained access to the storage space even without that key.

V.

For the foregoing reasons, the Motion to Suppress Evidence (filed March 8, 1989) is GRANTED. The Motion to Controvert Warrant and Suppress Evidence (filed April 19, 1989) is DENIED.

It is so ordered.