RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION:  2001 FED App. 0406P (6th Cir.)
File Name:  01a0406p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

          *v.*                                No. 00-5061

MICHAEL SAARI,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 99-20077—Julia S. Gibbons, District Judge.

Argued:  April 26, 2001

Decided and Filed:  November 21, 2001

Before:  BOGGS and CLAY, Circuit Judges; ROBERTS,
District Judge.*

_____

## COUNSEL

**ARGUED:**  Frederick H. Godwin, ASSISTANT UNITED
STATES ATTORNEY, Memphis, Tennessee, for Appellant.
Michael J. Stengel, Memphis, Tennessee, for Appellee.

---

* The Honorable Victoria A. Roberts, United States District Judge for
the Eastern District of Michigan, sitting by designation.

**ON BRIEF:** Tracy L. Berry, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellant. Michael J. Stengel, Memphis, Tennessee, for Appellee.

———————

**OPINION**

———————

ROBERTS, District Judge. In *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980), the Court summarized its now familiar holding as follows:

> In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

At issue in the instant appeal taken by the United States is whether the actions of the law enforcement officers who arrested Defendant Michael Saari crossed that firm line. We hold that they did and, therefore, **AFFIRM** the district court's decision to suppress the tainted evidence.

**I. *Background***

Defendant was indicted on thirteen counts of possession of firearms and ammunition after a protective order was entered against him, in violation of 18 U.S.C. §922(g)(8). His case was assigned to United States District Judge Julia S. Gibbons, who referred Defendant's Motion to Suppress the firearms and ammunition to Magistrate Judge Diane Vescovo for a report and recommendation. After an October 25, 1999 evidentiary hearing, Magistrate Judge Vescovo recommended that the Motion be granted. The Government filed objections and Judge Gibbons held an additional evidentiary hearing on December 10, 1999. Subsequently, Judge Gibbons granted Defendant's Motion to Suppress. *United States v. Saari*, 88 F. Supp. 2d 835 (W. D. Tenn. 1999). This appeal followed.

without exigent circumstances, in violation of the Fourth Amendment. Consequently, the Court **AFFIRMS** the district court's suppression of the gun seized incident to Defendant's illegal arrest.

dispose of the weaponry he was accused of possessing. Further, with officers surveilling every portal of Defendant's apartment, there was no danger that he would escape before a warrant could be secured. Finally, because there was no immediate or continuous pursuit of the Defendant from the scene of a crime, the officers were not in hot pursuit of a fleeing felon. *Welsh v. Wisconsin*, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984). Without the threat of immediate danger that would have given rise to exigent circumstances, the officers' safety did not require them to summon Defendant out of his house at gun point before obtaining an arrest warrant.

Although the Government insists that the officers had probable cause, it also emphasizes that the officers were not attempting to arrest Defendant. Rather, the Government argues, the officers only wanted to interview Defendant as part of their ongoing investigation. If the officers only wanted to talk to Saari, but were concerned about their safety in so doing, then they were required simply to summon him in a non-coercive fashion, using their own judgment as to how or if to warn him about any impending display of force. But, their desire to interview Defendant did not justify ordering him out of his home at gunpoint or constitute an exigent circumstance that excused their warrantless entry into Defendant's apartment.

Indeed, regardless of where Defendant was located, Defendant had the right to remain silent. U.S. Const. amend. V., *Miranda v. Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant's right to remain silent, coupled with his right to retreat into his own home and be free from unreasonable governmental intrusion, *Payton*, 445 U.S. at 590, leads to but one conclusion: the officers had no right to force Defendant out his home with their guns drawn to conduct an interview.

### III. *Conclusion*

The trial court properly held that Defendant's warrantless arrest was accomplished while he was in his home and

In her opinion, Judge Gibbons adopted Magistrate Judge Vescovo's proposed findings of fact, with certain modifications. On brief, the Government agreed that the district court's findings of fact were not clearly erroneous.[1] Thus, the following factual findings are not in dispute.

On March 14, 1999, Memphis Police Department Officers James Currin, Roberts Bridges, Galeocredo Bateman and Wilton Cleveland responded to a call regarding "shots fired" at the residence of Defendant's ex-wife, Anne Saari. Before proceeding to Defendant's apartment, Officers Bateman and Bridges went to speak to Ms. Saari. While there, Officers Bateman and Bridges learned that shots had not actually been fired. Rather, Defendant was observed standing in Ms. Saari's window with what appeared to be a pistol in his hand.[2] Ms. Saari informed the officers that Defendant was armed at all times. Additionally, Officer Currin testified that he received information from an unknown source that Defendant possessed explosives. Officer Cleveland testified that he was advised by an "unknown source" that Defendant belonged to a militia group and was heavily armed.

Eventually, the four officers went to Defendant's apartment, where the district court found the following transpired:

Upon arriving at defendant's apartment, the four officers decided to approach the house and make contact with defendant. Cleveland testified that the front door was closed and the shades were drawn, but he saw some

---

[1] At oral argument, however, the Government took exception to one narrow factual finding that the Court will describe, *infra.*

[2] The fact that the officers learned that shots had not actually been fired is not included in the district court's findings of fact. However, Officer Bateman testified to that effect during the December 10, 1999 suppression hearing. While not specifically referring to this portion of Officer Bateman's testimony, the district court found his testimony concerning his contacts with Ms. Saari to be credible.

movement inside the apartment through the drawn shades. Defendant's apartment was on the second floor. Cleveland and Currin positioned themselves on a landing approximately in front of defendant's front door. Bridges stood about four steps down from the landing and Bateman was positioned at the bottom of the steps. Cleveland had a 12-gauge, pump-action shotgun drawn and in a 'low ready' position, that is, pointed at approximately forty-five degrees toward the ground in front of the door. Currin had his service weapon drawn. Bridges testified that he drew his service weapon after officers Cleveland and Currin made contact with defendant and then immediately went to the top of the stairs. Bateman testified that she waited on the first floor with her gun drawn until she heard that defendant had been disarmed at which time she went to the second floor.

Cleveland and Currin knocked forcefully on defendant's apartment door and identified themselves as police as defendant answered the door. The officers were approximately four feet away from defendant. Cleveland testified that he thinks that defendant's door was still closed when the officers announced 'police.' Neither Currin nor Cleveland was able to recall whether defendant was ordered out or whether he came out. However, Cleveland testified that the officers would not have permitted defendant to stay inside his apartment. (Tr. at 65.) Defendant, on the other hand, specifically testified that when he opened the door, he was standing inside his apartment in the doorway. According to defendant, the officers had their weapons pointed at him and instructed him to step outside. The court finds defendant's uncontroverted testimony that he was ordered to come out of the apartment to be credible and finds as a fact that such order was given. Defendant testified that he stepped outside because he was ordered to do so and he was afraid of being shot. He stepped out with his hands above his head. While the guns were still trained on the defendant, one of the officers asked him if

**D.**

Contrary to the Government's argument otherwise, this Court's holding will not place police officers in jeopardy. The Government notes that officers are permitted to approach a suspect's home for an interview. *Alvarez v. Montgomery County*, 147 F.3d 354, 358 (4th Cir. 1998). *United States v. Daoust*, 916 F.2d 757, 758 (1st Cir. 1990). It further emphasizes the need for officers to protect themselves while approaching individuals that they have reason to believe may be armed and dangerous. However, the officers here did more than approach Defendant's apartment for an interview. They effected a constructive arrest of Defendant inside his apartment. And, the officers' safety concerns did not require them to act so precipitously.

Assuming, without deciding, that the Government is correct that the officers had probable cause to arrest Defendant, the officers had time to secure an arrest warrant. Armed with a warrant, the officers would have been permitted to arrest Defendant using all necessary precautions. The officers did not attempt to get a warrant.

Further, if exigent circumstances dictated – if Defendant had posed an immediate threat to the safety of the public or to the officers; if there was an immediate danger that Defendant would destroy evidence; if Defendant had posed a threat of fleeing before the officers could obtain a warrant; or, if the officers were in hot pursuit of Defendant because he was a fleeing felon – the officers would have been excused from the warrant requirement. *See Minnesota v. Olson*, 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). Had any of these exigent circumstances been present, the officers would have been permitted to effect an immediate arrest and to take all necessary precautions in the process.

However, no exigencies permitted Defendant's immediate arrest. As previously stated, there was no evidence that Defendant posed an immediate threat to the officers or the public at the time that the officers arrived at his apartment. Nor was there evidence that Defendant would or could readily

Additionally, the *Gori* court held that the officers acted reasonably in response to the "swiftly developing situation" they confronted. *Id.* at 54-55.

The encounter at the door of Apartment 1M was precipitated by the arrival of the food delivery ordered by the occupants. The situation reasonably called for some immediate measures, and we conclude that accompanying the delivery woman to the door was a reasonable course of action in the circumstances, if not the only or necessary one. If they let the delivery woman proceed unaccompanied after seeing police in the foyer, she might betray their presence intentionally or by her alarm; if they turned her away, the hungry occupants might have called the take-out restaurant to complain about the delay, and been alerted that way. The police could assume that once alerted, the occupants might have disposed of the contraband by the window or the toilet, or might have precipitated violence.

*Id.* at 55. See also *United States v Socey*, 846 F. 2d 1439 (D. C. Cir. 1988) (warrantless entry allowed where officers reasonably believe that occupants had been alerted to surveillance and would destroy evidence.

The present case is wholly distinguishable from *Gori*. Here, Defendant did not voluntarily expose himself to the public so as to eliminate the *Payton* requirements of a warrant or exigent circumstances. Defendant was summoned out of his house at the officers' command. Furthermore, as previously stated, there were no developing circumstances that required swift action by the officers. Consequently, Government's reliance on *Gori* is misplaced.[5]

---

[5] Because *Gori* is distinguishable, this Court is not presented with the occasion to agree or disagree with the *Gori* opinion.

he had any weapons. Defendant informed the officers that he had a gun in the waistband of his pants. The officers then removed a handgun from defendant's waistband and placed him in handcuffs. Because it was dark, neither officer was able to see the weapon before they asked defendant to step outside and asked him if he had a weapon.

*Saari*, 88 F. Supp. 2d at 838.

The officers cuffed Defendant and they entered his apartment. While the officers claimed that Defendant was asked to re-enter his apartment, Defendant testified that he was instructed to do so. Officer Currin observed several videotapes, a parabolic antenna and two green metal ammunition boxes in Defendant's living room. Over Defendant's vocal objections, the other officers began searching the apartment. They discovered rifles in a walk-in closet and in a closed bag in the bedroom, and a pistol and blow-dart gun in the bedroom. The items were not removed at that time, but, pursuant to a search warrant which issued two days later, the officers seized the items. The affidavit in support of the search warrant was based solely upon knowledge that the officers acquired when they had been in the apartment on the day of Defendant's arrest.

In his Motion to Suppress, Defendant argued that the rifles, guns and ammunition the officers found during the arrest and search of his apartment should be suppressed. The Motion was granted in its entirety. In this appeal, the Government asks this Court to "deny the defendant's motion to suppress the weapon seized from the waistband of his pants." Appellant's Brief, p. 32. Hence, the narrow issue before the Court is whether the district court erred in suppressing the gun found in Defendant's waistband at the time of his arrest.

## II. *Discussion*

### A.

The Government argues that it was merely attempting to interview Defendant in furtherance of its investigation, and that the officers acted reasonably in protecting themselves by having their guns drawn before initiating the interview. Further, the Government contends that the Defendant voluntarily exposed himself to the public by opening his door to the police. Consequently, the *Payton* proscription on warrantless in-home arrests does not apply. The district court disagreed, holding, "The record indicates that 'as a practical matter' defendant was under arrest from the inception of his encounter with the officers." *Saari*, 88 F. Supp. 2d at 838, *citing United States v. Morgan*, 743 F. 2d 1158, 1163 (6th Cir. 1984). This Court agrees.

The standard for determining whether an arrest has occurred was provided in *United States v. Mendenhall*, 446 U.S. 544, 554,100 S.Ct. 1870, 64 L.Ed.2d 497 (1980):

> We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

Here, the officers positioned themselves in front of the only exit from Defendant's apartment with their guns drawn. They knocked forcefully on the door and announced that they were the police. Upon opening the door, Defendant was instructed to come outside, which he did. Under these circumstances, a reasonable person would have believed that he was not free to leave. Tellingly, Officer Cleveland acknowledged that

### C.

In addition to attempting to distinguish this case from *Morgan*, the Government cites *United States v. Gori*, 230 F.3d 44 (2nd Cir. 2000), as support for its argument that the officers were properly conducting a *Terry* stop when they summoned Defendant out of his house. But *Gori* is inapposite. In that case, the officers involved had an informant arrange a drug transaction from Gori. Subsequently, when Gori emerged from an apartment to deliver the drugs, he was arrested and searched. Cocaine was discovered during the search. Gori informed the officers that someone in the apartment had given him the drugs and the officers, therefore, set up surveillance. After twenty or thirty minutes passed with no activity, a woman entered to deliver food to the apartment in question. The officers decided that their best course of action was to accompany the delivery woman to the apartment door. When the door was opened to receive the delivery, the officers ordered the apartment's occupants to step out into the hallway. At the suppression hearing, a sergeant testified that the occupants were not free to leave at that point.

The trial court in *Gori* granted the defendants' motions to suppress, but the Second Circuit reversed. It reasoned that the *Payton* requirements did not apply to the facts at hand because the apartment door had been voluntarily opened in response to the delivery person's knock.

> A suspect in her open doorway becomes 'as exposed to public view, speech, hearing, and touch as if she had been standing completely outside her house.' [*United States v. Santana*, 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)]. This analogy is adaptable to the facts here, because when the defendants voluntarily opened the door of Apartment 1M in response to a knock from the delivery person whom they invited, they created a vista from a public place or common area.

*Gori*, 230 F. 3d at 52.

described in this case cannot be characterized as an investigative stop. The *Terry* court authorized a departure from the usual warrant procedures when, unlike the circumstances of this case, the police are responding to their own on-the-spot observations.

> We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, or that in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances. But we deal here with an entire rubric of police conduct -- necessarily swift action predicated upon the on-the-spot observations of the officer on the beat -- which historically has not been, and as a practical matter could not be, subjected to the warrant procedure.

*Terry,* 392 U.S. at 20; 88 S.Ct. at 1879, (citations omitted). Here, the police did not observe Defendant doing anything suspicious. Upon their arrival, the officers were only able to observe Defendant's movement through drawn shades.

Nor were the officers responding to a swiftly developing situation, as the Government argues. The Government contends that the officers in this case were responding to an emergency, whereas the *Morgan* defendant did not represent an immediate threat to the officers or to the public. This argument is baseless. The trial court noted that Defendant was peaceably occupying his home when the officers arrived, and there was no proof that anyone was being threatened inside. "The unsubstantiated information about explosives by an unidentified person was too vague and general to constitute an immediate threat to the safety of the officers and the public." *Saari*, 88 F. Supp. 2d at 848.

The Government has, thus, failed to distinguish this case from *Morgan*. Its holding, that a constructive in-home arrest where neither a warrant is obtained nor exigent circumstances exists violates the Fourth Amendment, is applicable to the instant case.

Defendant would not have been permitted to stay inside of his apartment.[3]

**B.**

This case is, in all relevant respects, indistinguishable from *Morgan, supra.* In *Morgan,* the defendant was accused of shooting in a public park. After the defendant's car was spotted and followed to his mother's home, several officers proceeded there. Upon their arrival, the officers surrounded the house, flooded it with spotlights and summoned the defendant with a bullhorn. The defendant responded to the coercive activity by appearing at the front door with a pistol in his hand. He complied with the officers' demand that he put his gun down, and was formally arrested upon leaving the house.

As a justification for the officers' action, the Government argued that the officers had at least "reasonable suspicion" to conduct the type of brief investigatory stop authorized by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). According to the Government, once the defendant appeared at the door with his weapon in plain view, the officers were justified in immediately arresting him and seizing his weapon. The *Morgan* court rejected that argument, holding that the officers' conduct outside of the defendant's home could not be characterized as a brief investigatory stop; the defendant was, "as a practical matter," under arrest as soon as the officers surrounded the house. *Morgan* at 1164, *(quoting Florida v. Royer*, 460 U.S. 491,

---

[3] At oral argument, the Government disagreed with the district court's finding that Defendant was instructed to exit his apartment. It cites to Defendant's testimony during the suppression hearing that he was told, "Step outside, please. We need to talk. We would like to talk to you. Step outside, please." Notwithstanding the use of the word "please," the district court's finding that the quoted language amounted to an instruction was not clearly erroneous. Moreover, in light of Officer's Cleveland's testimony that Defendant would not have been permitted to stay in his apartment, there is no genuine dispute that Defendant was ordered to exit.

503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d, 743 F. 2d 229, 240 (1983)):

> To describe the encounter between the police and Morgan as a 'brief investigatory stop' ignores the facts of this case. Nine police officers and several patrol cars approached and surrounded the Morgan residence in the dark. The officer in charge strategically positioned his car in the driveway in front of the Morgan home blocking any movement of his car. The police then called for Morgan to come out of the house. These circumstances surely amount to a show of official authority such that a reasonable person would have believed he was not free to leave. Viewed objectively, Morgan was placed under arrest, without the issuance of a warrant, at the moment the police encircled the Morgan residence.

*Id.*, (citations and internal quotation marks omitted).

In response to the Government's argument that the officers did not violate *Payton* because they never crossed the threshold of the defendant's home, the *Morgan* court held that the relevant inquiry is the location of the person being arrested, not the arresting officer. *Id.* at 1166. "Although there was no direct police entry into the Morgan home prior to Morgan's arrest, the constructive entry accomplished the same thing, namely, the arrest of Morgan." *Id.*

As in *Morgan*, the officers here summoned Defendant to exit his home and acted with such a show of authority that Defendant reasonably believed he had no choice but to

comply.[4] His warrantless arrest was accomplished while he was in his home, in violation of the Fourth Amendment.

The Government's efforts to distinguish this case from *Morgan* are unavailing. It contends that this case is different from *Morgan* because, in that case, the officers were executing a planned arrest while the officers here were simply conducting an investigative stop.

As a factual matter, this Court echos the *Morgan* opinion and holds the officers' conduct outside of Defendant's home constituted a constructive entry and in-home arrest rather than an investigatory stop. Furthermore, like a full-blown arrest, an investigatory detention is a seizure that is subject to Fourth Amendment scrutiny. *Terry*, 392 U.S. at 16-17, 88 S.Ct. At 1877; *Morgan* at 1164 n. 1. Thus, *Payton's* holding that warrantless seizures of persons in their homes violate the Fourth Amendment, absent exigent circumstances, applies to this case regardless of whether the officers at issue were conducting an arrest or an investigatory detention.

Additionally, if the Court accepted the Government's legal argument, it would have the effect of providing lesser protection to individuals in their homes when the police do not have probable cause to arrest. It would defy reason to hold, as the Government suggests, that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest.

Furthermore, contrary to the Government's argument, summoning a person out of his or her home in the manner

---

[4] This case is, therefore, distinguishable from *U.S. v. Vaneaton*, 49 F.3d 1423, 1425 (9th Cir. 1995), which the Government relies upon. In that case, the uniformed officers had their guns in their holsters and said nothing upon knocking on the defendant's hotel room door. The defendant opened the window curtains, saw the officers and opened the door. There was no testimony in *Vaneaton* indicating that the defendant was faced with a show of force making it clear that he had no choice but to present himself for arrest.