*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 05a0460p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

*v.*

No. 04-6148

CHRISTOPHER TODD THOMAS,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 04-10031—James D. Todd, Chief District Judge.

Argued: September 23, 2005

Decided and Filed: December 1, 2005

Before: SILER and SUTTON, Circuit Judges; SHARP, District Judge.[*]

_____

**COUNSEL**

_____

**ARGUED:** Victor L. Ivy, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellant. C. Mark Donahoe, HARDEE, MARTIN, DAUSTER & DONAHOE, Jackson, Tennessee, for Appellee. **ON BRIEF:** Victor L. Ivy, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellant. C. Mark Donahoe, HARDEE, MARTIN, DAUSTER & DONAHOE, Jackson, Tennessee, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. The United States challenges a suppression-of-evidence ruling, arguing that the district court erred in concluding that police officers constructively entered a home without a warrant and without being able to satisfy any of the narrow exceptions to the warrant requirement. Because the police officers did not enter the house and because the defendant, Christopher Thomas, did not exit the house as a result of physical force or any other conspicuous show of authority by the police, *cf. United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984) and *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001), we reverse.

_____

[*]The Honorable Allen Sharp, United States District Judge for the Northern District of Indiana, sitting by designation.

I.

Early in the morning of October 21, 2003, Tim Higgins, the manager of the Oakland Gin Company in Lauderdale County, Alabama, noticed a pickup truck near the company's tank of anhydrous ammonia. His suspicion aroused, he followed the truck to a restaurant and confronted the driver, Christopher Thomas, who denied being near the tank. Higgins recorded the license number of the truck and reported the incident to local police.

Soon after receiving the report, Deputy Joe Hamilton spotted Thomas driving his truck and stopped him. When asked what he had been doing at the gin company, Thomas explained that he had been looking for a place to eat. Hamilton let him go but then proceeded to the gin company, where he observed that the fence around the tank had been cut, a wrench had been left on the ground and a hose had been tapped into the tank. Based on these observations, the police suspected Thomas of attempting to steal anhydrous ammonia, a chemical used in the production of methamphetamine.

At roughly 10:00 a.m. that morning, several Alabama-based and Tennessee-based police officers drove to the Tennessee home of Ginger Hopper, where Thomas had been living and which is near Lauderdale County, Alabama. There, they found Thomas's truck parked behind the house; one of the doors to the truck was open, and a Thompson .357 handgun lay on the front seat. The officers also noticed a silver canister in the back of the truck, similar to canisters that one of the officers recognized as having been used in other thefts of anhydrous ammonia.

Two officers knocked on the back door of Hopper's home, which served as the primary entrance to the home according to local police. Two officers went to the front door. Four patrol cars in total were parked at the house, and apparently one of the cars contained a fifth officer. When Thomas came to the back door, the officers "told [him] that the Alabama investigators wanted to talk to him and asked him to come out of the residence, which he did." D. Ct. Order at 5; *see also* Thomas Br. at 6 ("The Defendant was asked to come outside the residence."). After Thomas exited the house, he refused to talk and requested an attorney. At this point, the officers arrested him.

After the arrest, the police searched Thomas and discovered incriminating evidence, including methamphetamine and a handwritten recipe for making more. They also searched the truck and discovered two firearms as well as the scent of anhydrous ammonia.

The district court suppressed the evidence, holding that the arrest violated the Fourth Amendment. Under *Payton v. New York*, 445 U.S. 573 (1980), the court noted, police may not enter a home to make an arrest without a warrant in the absence of exigent circumstances. *Id*. at 590. And under *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), the court added, a "constructive entry" into a home in violation of *Payton* occurs whenever the police use "coercive [ ] conduct" to force a defendant outside of the home. *Id*. at 1166. Concluding that the police conduct in this instance was coercive, the district court held that a constructive entry into Hopper's home had taken place, that the police neither possessed a warrant nor established exigent circumstances for the entry and that the arrest accordingly was unlawful.

II.

"[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton*, 445 U.S. at 590. The question here is when we will deem officers to have crossed that "threshold" in law when they have not done so in fact. As there are no material disputes about what happened during the encounter in this case, the district court's determination that a constructive entry occurred receives de novo review. *See United States v. Buchanon*, 72 F.3d 1217, 1222–23 (6th Cir. 1995); *see also United States v. Mendenhall*, 446 U.S. 544, 554–55 (1980).

On one side of the ledger, the law has long permitted officers to engage in consensual encounters with suspects without violating the Fourth Amendment. *See, e.g.*, *Bennett v. City of Eastpointe*, 410 F.3d 810, 821 (6th Cir. 2005) ("A purely consensual encounter between a police officer and a citizen does not implicate the Fourth Amendment."); *United States v. Hudson*, 405 F.3d 425, 439 n.10 (6th Cir. 2005) ("The police were of course free to approach Hudson and talk with him so long as they did not do so in a manner that would lead a reasonable person to feel that he was not free to leave."); *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) ("[T]he consensual encounter may be initiated without any objective level of suspicion.").

Consensual encounters do not lose their propriety, moreover, merely because they take place at the entrance of a citizen's home. A number of courts, including this one, have recognized "knock and talk" consensual encounters as a legitimate investigative technique at the home of a suspect or an individual with information about an investigation. *See, e.g.*, *United States v. Chambers*, 395 F.3d 563, 568 n.2 (6th Cir. 2005) ("Courts generally have upheld [the knock and talk] investigative procedure as a legitimate effort to obtain a suspect's consent to search."); *Ewolski v. City of Brunswick*, 287 F.3d 492, 504–05 (6th Cir. 2002) (concluding that it was reasonable to approach a suspect's home to attempt to learn more through consensual questioning); *Nash v. United States*, No. 03-6630, 2004 WL 2912796, at *1 (6th Cir. Dec. 16, 2004) (noting that this court has "explicitly upheld the legitimacy of doorstep investigatory interviews"); *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); *United States v. Cormier*, 220 F.3d 1103, 1109 (9th Cir. 2000) (holding that "no suspicion needed to be shown in order to justify the 'knock and talk'"); *United States v. Jerez*, 108 F.3d 684, 691–92 (7th Cir. 1997) (recognizing that a knock and talk is ordinarily consensual unless coercive circumstances exist); *United States v. Titemore*, 335 F. Supp. 2d 502, 505 (D. Vt. 2004) ("Under the rule permitting knock and talk visits, no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors.") (quotation omitted).

On the other side of the ledger, we have held that a consensual encounter at the doorstep may evolve into a "constructive entry" when the police, while not entering the house, deploy overbearing tactics that essentially force the individual out of the home. In *United States v. Morgan*, 743 F.2d 1158 (6th Cir. 1984), we held that a "constructive entry" occurred when a suspect emerged from a house "in response to coercive police conduct." *Id.* at 1166. And in *United States v. Saari*, 272 F.3d 804 (6th Cir. 2001), we described coercive police conduct as "such a show of authority that [the] Defendant reasonably believed he had no choice but to comply." *Id.* at 809.

The difference between the two—between a permissible consensual encounter and an impermissible constructive entry—turns on the show of force exhibited by the police. In *Nash*, for example, we described a typical consensual encounter: "No testimony . . . indicate[d] drawn weapons, raised voices, or coercive demands on the part of the police . . . . Rather, Nash opened the door willingly, and when requested, stepped out onto the porch." 2004 WL 2912796, at *1. *Morgan*, by contrast, involved a team of ten officers who surrounded the house, blocked the suspect's car, "flooded the house with spotlights and summoned Morgan from his mother's home with the blaring call of a bullhorn." 743 F.2d at 1161. And *Saari* involved four officers who "knocked forcefully on the door and announced that they were the police." 272 F.3d at 808. One officer "had a 12-gauge, pump-action shotgun drawn and in a 'low ready' position, that is, pointed at approximately forty-five degrees toward the ground in front of the door." *Id.* at 806. The others had their service weapons drawn, and, "[u]pon opening the door, Defendant was instructed to come outside, which he did." *Id.* at 808; *see also Sharrar v. Felsing*, 128 F.3d 810, 819 (3d Cir. 1997) (holding that "[n]o reasonable person would have believed that he was free to remain in the house" when the police surrounded the house, pointed machine guns at the windows and ordered the occupants out); *United States v. Maez*, 872 F.2d 1444, 1450 (10th Cir. 1989) (holding that when a

SWAT team surrounded a trailer with rifles pointed at the home and addressed the occupants over loudspeakers "a reasonable person would have believed he had to come out of the home"); *United States v. Edmondson*, 791 F.2d 1512, 1514 (11th Cir. 1986) (holding that a suspect's consent to entry was coerced when FBI officers surrounded the front of the defendant's apartment, with weapons drawn, and yelled, "FBI. Open the door."); *United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985) (holding that an arrest occurred when "the police had completely surrounded appellee's trailer with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees"); *see also United States v. Johnson*, 626 F.2d 753, 757 (9th Cir. 1980) (holding that *Payton* prohibits "subterfuge in getting the suspect to open the door" because such an exposure is "nonconsensual").

Measured by these decisions, the officers' conduct in this case did not rise to the level of a constructive entry. Two officers "knocked on the rear door . . . . When Defendant came to the door, Officer Cunningham told Defendant that the Alabama investigators wanted to talk to him and asked him to come out of the residence, which he did." D. Ct. Order at 5. As in *Nash*, "[n]o testimony . . . indicate[d] drawn weapons, raised voices, or coercive demands on the part of the police." 2004 WL 2912796, at *1. Thomas responded to a simple knock and request, not an order to emerge or the threat of firearms. And he has given us no basis for concluding that a reasonable person, confronted with a knock on the door by police officers, would believe without more that he was either under arrest or otherwise compelled to leave the house. On this record, no "constructive entry" occurred.

This determination not only respects the line between consensual and coercive encounters drawn by our precedents but also respects the line drawn in this area by other circuit courts. In *United States v. Vaneaton*, 49 F.3d 1423 (9th Cir. 1995), for example, the suspect voluntarily exposed himself to the police by opening his hotel door in response to a knock on the door by police. The court noted that "[n]o threats or force were used by the police to get him to open the door, and his actions were not taken in response to a claim of lawful authority." *Id.* at 1427. Thus, the court held, the exposure to police was voluntary, the subsequent arrest lawful. *Id.*; *see also Saari*, 272 F.3d at 809 n.4 (noting, in distinguishing *Vaneaton*, that "the uniformed officers had their guns in their holsters and said nothing upon knocking . . . . The defendant opened the window curtains, saw the officers and opened the door. There was no testimony in *Vaneaton* indicating that the defendant was faced with a show of force making it clear that he had no choice but to present himself for arrest"). *See also Cormier*, 220 F.3d at 1109 (holding that no Fourth Amendment violation occurred when an officer "knocked on the door for only a short period spanning seconds" and "never announced that she was a police officer while knocking nor did she ever compel Cormier to open the door under the badge of authority. Because there was no police demand to open the door . . . there is no evidence to indicate that the encounter was anything other than consensual") (citations omitted); *Duncan v. Storie*, 869 F.2d 1100, 1102 (8th Cir. 1989) (suggesting that no Fourth Amendment violation would occur when "an individual voluntarily left the confines of his home . . . [and] the arrest was made in a public place"); *United States v. Mason*, 661 F.2d 45, 47 (5th Cir. 1981) (holding that no Fourth Amendment violation occurred when defendant came to doorway as agents approached the house and was then placed under arrest); *United States v. Botero*, 589 F.2d 430, 432 (9th Cir. 1978) (holding that no Fourth Amendment violation occurred when "in response to (the agent's) knock, the door was opened by defendant Botero [and he] was placed under arrest at that time"); *Fredericks v. Wright*, No. 94-35494, 1995 WL 23651, at *2 (9th Cir. Jan. 20, 1995) (holding that no Fourth Amendment violation occurred when "government officers [] knock[ed] on an individual's door and [] arrest[ed] the individual when the door [was] opened, even if the individual [was] still standing in the doorway"); *United States v. Von Marschner*, No. 86-5334, 1988 WL 65553, at *2 (9th Cir. June 16, 1988) (holding that no Fourth Amendment violation occurred when seven agents "knocked on Von Marschner's door, identified themselves, and invited Von Marschner to step outside"); *see also* 3 Wayne LaFave, Search and Seizure § 6.1(e) (4th ed. 2004) ("It has been deemed unobjectionable that the defendant came outside at the request of police who

did not reveal their intention to arrest . . . . [H]owever, the warrantless arrest will be illegal if the defendant's presence outside was acquired by coercion.").

To the extent other circuits have drawn a line different from the one we have drawn, it is a line that is *less* protective of individual liberties and one that turns solely on whether the officers in fact crossed the physical threshold of the entrance to the home. *See Knight v. Jacobson*, 300 F.3d 1272, 1277 (11th Cir. 2002) ("*Payton* keeps the officer's body outside the threshold, not his voice. It does not prevent a law enforcement officer from telling a suspect to step outside his home and then arresting him without a warrant."); *United States v. Berkowitz*, 927 F.2d 1376, 1386 (7th Cir. 1991) (*Payton* prohibits only a warrantless entry into the home, "not a policeman's use of his voice to convey a message of arrest from outside the home"); *United States v. Carrion*, 809 F.2d 1120, 1128 (5th Cir. 1987) (holding that *Payton* was not violated when police, without crossing the threshold, pointed guns at and arrested the defendant when he was still within the hotel room).

Thomas offers three arguments in attempting to counter the conclusion that the officers did not violate his Fourth Amendment rights. He first claims that the opinion by Judge Cabranes in *United States v. Karagozian,* 715 F. Supp. 1160 (D. Conn. 1989), leads to a different outcome. True, that case, like this one, involved a visit by police to the rear deck of a house and, true, the court held that the police violated the Fourth Amendment in the course of the encounter. But in today's case the rear deck was adjacent to the driveway and served as the primary entrance to Hopper's home. There, by contrast, the rear deck "was not a place, such as a driveway, with ready access to visitors." *Id.* at 1164. In *Karagozian*, the police thus violated the Fourth Amendment *before* they knocked on the suspect's door by breaching "the reasonable expectation of privacy that Karagozian had regarding his rear deck." *Id.* On that basis, the court concluded that "the doctrine of *Payton* applies to an arrest made on the rear deck of the Karagozian home." *Id.* Here, however, Thomas does not argue that he had a reasonable expectation of privacy in the back of Hopper's house—an argument that at all events could not be squared with the district court's finding that the back door "was customarily used as the entrance to the house." D. Ct. Order at 12.

Thomas next contends that the testimony of the officers, who "considered Defendant to be under arrest as soon as he came to the door," D. Ct. Order at 16, establishes that the encounter was coercive. But by now it is well established that the state of mind of arresting police officers does not establish whether a seizure in general or a constructive entry in particular has occurred. *See Mendenhall*, 446 U.S. at 554 n.6 ("[T]he subjective intention [of law enforcement] to detain . . . is irrelevant except insofar as that may have been conveyed to the respondent."); *United States v. Waldon*, 206 F.3d 597, 603 (6th Cir. 2000) ("Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity."); *see generally Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.").

Thomas lastly argues that the number of officers involved in his ultimate arrest—five—establishes that the encounter was coercive. But the number of officers involved in this investigation was neither inherently coercive nor unjustified. Keep in mind that two different jurisdictions had an interest in the investigation—officers from Alabama (where the suspected crime had occurred) and officers from Tennessee (where the suspect was staying). Sending two officers to the primary entrance in the rear of the house was hardly unreasonable in the course of a drug-manufacturing investigation, and having other officers on hand in the event a conflict arose made abundant sense as well. Why four police vehicles were needed for five officers (particularly given today's gas prices) was never explained. But Thomas has never argued that he saw all of these vehicles before leaving the house or that the number of vehicles at the house somehow converted the incident into a coercive encounter. In the final analysis, officers may take reasonable security precautions in doing their jobs, and bringing several officers to investigate a potential methamphetamine lab would seem to be doing just that. *See Terry v. Ohio*, 392 U.S. 1, 23 (1968)

("Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."); *United States v. Layne*, 324 F.3d 464, 470 (6th Cir. 2003) (noting that a methamphetamine lab is an inherently dangerous place); *United States v. Bohannon,* 225 F.3d 615, 617 (6th Cir. 2000) ("The possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious.") (quotation omitted).

## III.

For these reasons, we reverse the judgment of the district court and remand the case for further proceedings consistent with this opinion.