Filed 9/29/20  P. v. Tschanz CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE, | C090540 |
| Plaintiff and Respondent, | (Super. Ct. No. P18CRF0317) |
| v. | |
| MELISSA DAWN TSCHANZ, | |
| Defendant and Appellant. | |

A jury found defendant Melissa Tschanz guilty of felony identity theft and misdemeanor giving false information to a police officer.  The trial court further found true a prior strike allegation.  On appeal, defendant argues:  (1) the police officers violated defendant's Fourth Amendment rights when they arrested her without probable cause and the trial court thus abused its discretion in denying her motion to suppress; (2) the trial court erred in admitting defendant's statements to a police officer because the statements were made during a custodial interrogation in the absence of defendant

1

receiving *Miranda*[1] warnings; (3) the evidence at trial was insufficient to support defendant's misdemeanor conviction because the prosecution failed to prove she was detained when she gave a false name to a police officer; (4) she received ineffective assistance of counsel if defense counsel's concession of defendant's guilt as to the misdemeanor charge constituted the only substantial evidence supporting the conviction; and (5) the trial court erred in finding true the prior strike allegation because defendant's Washington robbery conviction does not constitute a strike in California.

The People concede the trial court erred in finding true the prior strike allegation but request we remand the matter for further proceedings in accordance with *Gallardo*. (*People v. Gallardo* (2017) 4 Cal.5th 120, 139.)  They maintain the remainder of defendant's arguments are without merit.

We accept the People's concession and reverse the true finding regarding the prior strike allegation; we remand the matter for further proceedings.  In all other respects, we affirm the judgment.

DISCUSSION

Defendant's arguments require the recitation of testimony given and/or evidence received at four phases in this criminal matter -- the motion to suppress hearing, the preliminary examination hearing, trial, and a hearing on defendant's motion to strike the prior strike allegation.  To avoid confusion and for the reader's ease, we discuss the testimony and/or evidence pertinent to each argument in the discussion of that issue below.

---

[1]    *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

2

I

*Motion To Suppress*

A

*Hearing Testimony*

1

*Detective Michael Roberts*

Detective Michael Roberts testified he and Detective Alonso Aguilar drove to a motel on July 18, 2018, around noon to look for C. Kerby, a female with an outstanding felony arrest warrant and driving a stolen rental car.[2] The detectives went there because the motel, "in [Detective Roberts's] experience, is a common place for known wanted subjects to stay." The detectives noticed a rental car parked in the motel parking lot.

The motel manager directed the detectives to room 213,[3] which was located on the second floor. The manager provided Detective Roberts with a copy of the California driver's license a woman used to rent the room. The name on the driver's license was J. Farnham. Farnham's picture resembled the physical description of Kerby in that the women had the same relative build, hair color, and hair style. Detective Roberts did not pay attention to the height and weight listed on the driver's license; he was focused on whether the license "could be passed off as the person [he] was looking for." Detective Roberts explained: "Based on my training and experience I know that specifically at this particular hotel that subjects who are wanted or are engaged in nefarious activity often

---

[2]     Defense counsel objected to Detective Aguilar's statement, "[w]e had received information that the female we were looking for was driving a stolen rental car," as hearsay. The trial court overruled the objection with the understanding the statement was being offered to show what happened next based on the information provided to Detective Roberts.

[3]     Detective Roberts did not elaborate on the discussion with the hotel manager.

use stolen or false [identifications] to rent motel rooms, so I was under the belief that the subject may have used a false [identification] to rent the room."

The detectives went to room 213. Detective Aguilar knocked on the door and a female asked "who was there." Detective Aguilar said "it was the Sheriff's office" and they needed to confirm the woman's identity to make sure she was not the person they were seeking. Detective Roberts heard "a lot of rustling around and a lot of movement" in the room, raising concerns the woman inside was attempting to destroy or conceal evidence or attempting to flee out of the back window. Detective Roberts accordingly went into the adjoining room and stuck his head out of the window to make sure the woman was not attempting to flee. Detective Aguilar continued talking to the woman but Detective Roberts could not hear what was being said. Neither detective drew a weapon. At some point, two other officers joined the detectives at the motel. One of those officers was Detective Roberts's supervisor, Sergeant Robert St. Pierre.

The woman inside the room opened the door after approximately 10 minutes. Detectives Roberts and Aguilar entered the room. Sergeant St. Pierre also entered the room at some point, whereas the fourth officer remained in the hallway or in the doorway of the room. The woman was not handcuffed or placed under arrest. Detective Roberts identified defendant as the woman in the motel room.

Detective Roberts noticed defendant was not Kerby; he also noticed she was not Farnham. Detective Roberts suspected Farnham's driver's license had been stolen and defendant was wanted by the police. Detective Roberts thus asked defendant to identify herself. Defendant initially refused to provide her name. Sergeant St. Pierre also spoke with defendant in the bathroom area of the room, attempting to elicit information from her. Defendant was uncooperative, evaded the questions, and appeared upset at the officers' presence.

After approximately five minutes of questioning, defendant told Detective Roberts her name was Tanya Charles and provided him with a date of birth. Defendant also

4

admitted to Detective Roberts that she had used a false identification to rent the motel room. Detective Roberts used the name and date of birth provided by defendant to check for outstanding warrants; he concluded defendant was not wanted and the officers left. The time lapse between the police entering and leaving the motel room was approximately 10 to 15 minutes.

Defendant was not arrested on July 18, 2018, and was never told she was under arrest or being detained.

2

*Detective Alonso Aguilar*

Detective Aguilar testified he and Detective Roberts went to the motel to look for Kerby, who had an outstanding felony arrest warrant. The detectives had information indicating Kerby was at the motel and possibly driving a stolen car. The detectives showed a motel employee a photo and asked to whom the rental car in the parking lot belonged. The motel employee showed the detectives a copy of a driver's license and directed them to a specific room. The physical description on the driver's license "was fairly similar to [Kerby's] physical descriptions." Detective Aguilar explained, "it's pretty well known that individuals who are wanted sometimes use [identifications] that they come across by various ways to obtain rooms or -- or break other laws."

The detectives went to a room on the second floor to investigate whether Kerby was there. Detective Aguilar knocked on the door and waited for a response. A woman "asked what [they] wanted" and Detective Aguilar identified himself "as the Sheriff's office." Detective Aguilar told the woman they were looking for Kerby. He tried for approximately five to 10 minutes to get the woman to open the door. Detective Aguilar called the woman inside the room by Kerby's first name because he believed he was speaking with Kerby.

Detective Aguilar told the woman whom he called by Kerby's first name: "I have a felony warrant for your arrest. You're going to be under arrest." He further used a

5

ruse, stating "something to the effect of we have a canine coming" and, if the dog went into the room, she could get hurt. Detective Aguilar further repeatedly told the woman, "open the door, we're not going anywhere, we know you're inside." He never, however, told the woman she (not Kerby) was under arrest. Detective Aguilar had his gun unholstered while he was talking through the door.

The woman eventually opened the door. Detective Aguilar identified defendant as the woman in the motel room that day. Upon seeing defendant inside the room, Detective Aguilar immediately realized she was not Kerby. Detective Aguilar believed that, while he was talking to defendant through the door, there were four police officers including himself on the scene.

Before defendant opened the door, Detective Aguilar believed the woman inside the room was Kerby based on the "totality of the circumstances": the detectives had information indicating Kerby was at the motel with a stolen car, they saw a rental car in the motel parking lot, the motel employee showed them the driver's license of the person associated with the rental car and the physical description on the license was similar to Kerby's physical description, and the female in the room was acting suspicious by making rapid movements and having a nervous tone in her voice. Detective Aguilar acknowledged, however, that the description from the driver's license "was a general description that would fit a lot of different people."

3

*Defendant*

Defendant testified officers banged on the motel room door and told her they had a warrant and wanted her to verify her identity. She told them she "was not the person [who] they were looking for and that [she] did not want to answer the door." Defendant further told the officers she wanted to call her attorney. The officers did not provide a name or description of the person identified in the warrant. After approximately 10 minutes, one of the officers told defendant "the dogs were on their way and that he didn't

6

want to see [her] get hurt." The officer explained "that if he had to [do] that he was going to go down and get a motel manager to come up and open the door, and that he did not want to see [defendant] get hurt by the dogs." Defendant opened the door because she was scared and did not know if the motel manager would open the door.

B

*Trial Court's Ruling*

In her motion to suppress, defendant sought to suppress all evidence obtained during the "unlawful detention" at the motel, including her statements to Detective Roberts regarding her identity. The trial court found the encounter between the detectives and defendant was not consensual but, based on the detectives' testimony and the felony arrest warrant for Kerby, the totality of the circumstances showed there was probable cause to believe Kerby was in the room. The court explained: "And I will indicate I'm giving significant weight to the fact that the officers were at the door, which they certainly had the right to be, and they had a ten-minute conversation indicating they were looking for Ms. Kerby and the person wouldn't open the door. That almost by itself would establish reasonable suspicion and/or probable cause to make the officers believe that Ms. Kerby was behind the door. [¶] There was much more than that, of course. The information they had when they went to the [m]otel, the stolen rental car, the driver's license that was used in somebody's [*sic*] else's name. So frankly this whole thing could have been avoided if they just asked the -- strike that. [¶] By the time the door was opened, the police, the deputies who were present at the scene, had plenty of reason to go to the [m]otel manager, ask for the key, and enter themselves to affect the arrest warrant. The motion to suppress is respectfully denied."

C

*The Trial Court Did Not Err In Denying Defendant's Motion To Suppress*

Defendant argues the trial court erred in denying her motion to suppress because the detectives violated her Fourth Amendment rights when they arrested her without

7

probable cause. Defendant claims she was "under arrest when a police officer knocked on her door with his gun drawn and told her that she was 'under arrest.' " (Bolding omitted.) She explains, "[a]t the moment of [her] arrest[,] no reasonable person would have had a strong belief that Kerby was in room 213" and thus there was no probable cause to arrest her. (Bolding omitted.) Defendant believes Detective Aguilar "did not have even reasonable suspicion to detain" her prior to her opening the motel room door. She asserts, "[b]ecause [her] convictions were based entirely on evidence seized as a direct result of the illegal arrest, this court must reverse those convictions."

The People argue defendant was not placed under arrest when the detectives knocked on her motel room door; the detectives instead lawfully entered the room because they had a felony arrest warrant for Kerby and had reason to believe Kerby was in the room when they entered. The People maintain defendant was thereafter lawfully detained to investigate whether a false or stolen identification had been used to rent the room.

Defendant replies a reasonable person would have believed she was under arrest given Detective Aguilar's behavior. She further asserts Detective Aguilar did not have an objectively reasonable belief that Kerby was in the room because, when each fact identified by the People is viewed in isolation, none of the facts support such a conclusion.

We conclude defendant was not under arrest when the police knocked on the motel room door. We further conclude defendant's detention and the detectives' entry into the room were lawful. To avoid confusion given the scattered arguments presented by the parties, we analyze the propriety of the events in three segments: (1) the encounter prior to defendant's opening the door; (2) the detectives' entry into the room in the absence of defendant's consent; and (3) the detention following the detectives' entry into the room.

8

### 1

#### *Standard Of Review*

"When the trial court rules on a motion to suppress it makes three determinations: 1) it determines the facts, 2) selects the applicable rule of law, and 3) applies the latter to the former to determine whether or not the rule was violated. [Citation.] On appeal the first inquiry is subjected to review for substantial evidence. [Citation.] As to the second we apply our independent review applicable to a pure question of law. [Citation.] As to the third, the reasonableness of the challenged conduct, this court again applies an independent judgment standard of review." (*People v. Brophy* (1992) 5 Cal.App.4th 932, 936.)

### 2

#### *Defendant Was Not Under Arrest*

Defendant argues she was under arrest when "Detective Aguilar knocked on [the] door with his gun drawn, told her in an assertive voice with 'authority' that he was a police officer with a warrant for her arrest, and told her that he would not leave until she '[came] out' of the room to be placed 'under arrest.' " She further challenges the trial court's alleged presumed and implicit factual finding that "the arrest took place when 'the door was opened' to [defendant's] room." Defendant asserts the finding is unsupported by the evidence because "the arrest took place well before [she] opened the door."

The People argue the circumstances were "not akin to a formal arrest -- the officers were calling out that they were going to arrest a *different person* and specifically told [defendant] they would leave if she confirmed she was not Kerby." As to Detective Aguilar's unholstered gun, the People assert "there is no evidence [defendant] ever saw Detective Aguilar with his gun unholstered because the motel room door was closed." We conclude defendant was not under arrest.

"For purposes of Fourth Amendment analysis, there are basically three different categories or levels of police 'contacts' or 'interactions' with individuals, ranging from

9

the least to the most intrusive.  First, there are . . . 'consensual encounters' [citation], which are those police-individual interactions which result in no restraint of an individual's liberty whatsoever -- i.e., no 'seizure,' however minimal -- and which may properly be initiated by police officers even if they lack any 'objective justification.' [Citation.]  Second, there are what are commonly termed 'detentions,' seizures of an individual which are strictly limited in duration, scope and purpose, and which may be undertaken by the police 'if there is an articulable suspicion that a person has committed or is about to commit a crime.'  [Citation.]  Third, and finally, there are those seizures of an individual which exceed the permissible limits of a detention, seizures which include formal arrests and restraints on an individual's liberty which are comparable to an arrest, and which are constitutionally permissible only if the police have probable cause to arrest the individual for a crime."  (*Wilson v. Superior Court* (1983) 34 Cal.3d 777, 784.)

" '[T]here is no hard and fast line to distinguish permissible investigative detentions from impermissible de facto arrests.  Instead, the issue is decided on the facts of each case, with focus on whether the police diligently pursued a means of investigation reasonably designed to dispel or confirm their suspicions quickly, using the least intrusive means reasonably available under the circumstances.'  [Citations.]  Important to this assessment, however, are the 'duration, scope and purpose' of the [interaction]." (*People v. Celis* (2004) 33 Cal.4th 667, 674-675.)

As to duration, "the United States Supreme Court has said that ' "the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion." ' " (*People v. Celis*, *supra*, 33 Cal.4th at p. 675.)  As to scope, even stopping a suspect at gunpoint, handcuffing him or her, and holding him or her for 30 minutes or longer is a detention and not an arrest when the officers' actions do not go beyond those necessary to quickly dispel or confirm police suspicions of criminal activity.  (*Id.* at pp. 675-676.)

10

Before we delve into the analysis, we address two problems with defendant's arguments. First, defendant's repeated assertions that Detective Aguilar told her *she* was under arrest are not supported by the record. Detective Aguilar testified he told defendant they were looking for Kerby and he called defendant by Kerby's first name because he believed Kerby was in the room. Detective Aguilar said the detectives had a felony warrant for Kerby's arrest and Kerby would be under arrest. Detective Aguilar expressly testified he never told defendant *she* was under arrest. Defendant did not testify to the contrary. Accordingly, none of the numerous cases cited by defendant for the proposition that a person is under arrest when an officer tells him or her that he or she is under arrest are pertinent or applicable under the facts of this case and we need not address them.

Second, nothing in the trial court's ruling indicates the court found defendant was under arrest at any time, as defendant asserts. Nor did the trial court find probable cause *to arrest defendant* during the encounter at the motel. The trial court found there was probable cause for the detectives to lawfully enter the motel room to effectuate the arrest warrant on *Kerby*. We thus do not address defendant's unsupported assertion that the trial court made a factual error as to when the alleged arrest occurred.

Turning to the nature of the interaction between defendant and the detectives prior to defendant's opening the door, we note the purpose of the interaction was to determine whether defendant was Kerby. Indeed, the detectives told defendant they needed to confirm she was not the person they were seeking, and defendant testified an officer told her they wanted to verify her identity. The interaction was short in duration -- approximately 10 minutes -- and, as to scope, the detectives merely knocked on the door and conversed with defendant in an effort to get her to open the door. The interaction was not akin to an arrest. That Detective Aguilar had his gun unholstered while he was talking to defendant through the door does not convert the interaction into an arrest.

11

We agree with the trial court that the interaction was not consensual. Detective Aguilar's refusal to leave and take "no" for an answer coupled with the ruse of having a canine enter the motel room conveyed a message that compliance with his requests was required. (*Florida v. Bostick* (1991) 501 U.S. 429, 437 [115 L.Ed.2d 389, 400] [a person is detained when, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that [she] was not at liberty to ignore the police presence and go about [her] business' "].) A reasonable person would have believed he or she was not free to ignore the detectives' demands and to continue about his or her business. (See *United States v. Jerez* (7th Cir. 1997) 108 F.3d 684, 692-693.) We thus conclude defendant was detained prior to her opening the motel room door.

3

*Defendant's Detention Prior To Her Opening The Motel Room Door Was Lawful*

Defendant argues Detective Aguilar did not have probable cause to arrest her and, alternatively, he had no reasonable suspicion to detain her when she refused to open the door. The People do not address this argument, instead focusing on the legality of the officers' entry into the motel room and defendant's detention thereafter. We conclude the detectives had reasonable suspicion to detain defendant when she refused to open the door.

"A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) The reasonable suspicion standard is "less demanding than probable cause 'not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required

12

to show probable cause.' " (*Id.* at pp. 230-231.) "The government interest in apprehending individuals with outstanding warrants outweighs the minimal intrusion on the liberty of an individual occasioned by a brief detention" to determine whether he or she is the person named in the warrant. (*People v. Conway* (1990) 222 Cal.App.3d 806, 814-815.)

When the detectives went to room 213, they had a felony arrest warrant for Kerby and information that Kerby was at the motel and possibly driving a stolen rental car. Detective Roberts explained the motel, "in [his] experience, is a common place for known wanted subjects to stay." The detectives had observed a rental car in the motel parking lot and had confirmed the car belonged to the woman in room 213. Detective Roberts had also reviewed the driver's license used to rent the room and believed the photograph on the license "could be passed off as [Kerby]" based on build, hair color, and hair style. Detective Aguilar similarly believed the description on the driver's license was similar to Kerby's physical description. Both of the detectives testified that wanted individuals often use stolen or false identifications to rent a room.

After Detective Aguilar knocked on the motel room door and identified himself as "the Sheriff's office," he told defendant they were looking for Kerby and they had a felony warrant for Kerby's arrest. He further told defendant he needed to verify her identity. Defendant said she was not the person they were looking for and she did not want to open the door. Detective Aguilar testified defendant had a nervous tone in her voice and made rapid movements inside the room. Detective Roberts also heard "a lot of rustling around and a lot of movement" in the room after Detective Aguilar announced himself, raising concerns defendant was attempting to destroy or conceal evidence or attempting to flee out of the back window. What had been a consensual encounter up to this point (see *United States v. Thomas* (6th Cir. 2005) 430 F.3d 274, 277 [collecting cases stating " 'knock and talk' " encounters are ordinarily considered consensual and a reasonable investigative tool]) turned into a detention, as explained *ante*, based on

13

Detective Aguilar's refusal to leave and take "no" for an answer coupled with the ruse of having a canine enter the motel room (see *United States v. Jerez, supra*, 108 F.3d at pp. 691-692 [consensual encounter turned into investigatory stop after the occupants of a motel room refused to open the door and the officers persisted "in the face of the refusal to admit"]).

Under the totality of the circumstances, we conclude the detectives had reasonable suspicion to believe Kerby was in the room and to detain defendant to verify her identity. We do not accept defendant's apparent invitation to consider whether each of the pertinent facts, standing alone, is enough to give rise to reasonable suspicion that Kerby was in the motel room. (See *United States v. Sokolow* (1989) 490 U.S. 1, 9 [104 L.Ed.2d 1, 11] [the court looks at the totality of the circumstances].) We nonetheless address a few of defendant's arguments regarding the propriety of considering some of the facts.

Defendant argues the trial court erred in relying on "the fact that Kerby had stolen a rental car" because defense counsel objected to Detective Roberts's testimony on hearsay grounds and the trial court "ruled that the evidence would not be admitted for its truth, but only to explain 'what happened next' in the investigation." We need not address this argument because Detective Aguilar also testified that the detectives had information indicating Kerby was possibly driving a stolen rental car. Defense counsel did not object to this testimony.

Defendant further argues the stolen rental car testimony was irrelevant because "[t]here was no testimony regarding what type of rental car Kerby had stolen, or what type of rental car the detectives saw in the parking lot." The detectives testified they had information Kerby was driving a stolen rental car. That is it. Nothing in the testimony indicates the detectives had any additional information, such as the make, model, year, or color of the car. We do not deem the fact irrelevant merely because the information known to the detectives was limited.

14

Defendant also argues the detectives' testimony regarding Kerby's likeness to the photograph on the driver's license is not pertinent because the detectives merely said Kerby looked like the person in the photograph in a general way. Defendant misses the point. As Detective Roberts explained, he looked at the photograph on the driver's license to see whether the license "could be passed off as the person [he] was looking for" because, based on his experience, he believed "the subject may have used a false [identification] to rent the room." This testimony was relevant to what the detectives knew at the time of the detention and appropriately forms part of the totality of the circumstances.

We find no merit in the remainder of defendant's contentions relating to probable cause given that defendant was not under arrest.

4

*The Detectives' Entry Into The Motel Room Was Lawful*

The People assert the detectives lawfully entered the motel room because they had a felony arrest warrant for Kerby and had reason to believe she was in the room. "An arrest warrant 'founded on probable cause' that the suspect has committed a crime gives law enforcement officers 'the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.' " (*People v. Downey* (2011) 198 Cal.App.4th 652, 660, quoting *Payton v. New York* (1980) 445 U.S. 573, 603 [63 L.Ed.2d 639, 661].) As explained in *Downey*, the appropriate test is whether the detectives had objectively reasonable grounds to believe Kerby was in the motel room. (*Downey*, at p. 662.) Defendant asserts the information known to the detectives at the time they entered the motel room did not meet this standard. We conclude the facts discussed *ante* with regard to the detectives' reasonable suspicion to support the detention also support the People's position and the trial court's finding that the detectives had objectively reasonable grounds to believe Kerby was in the motel room. The detectives' entry into the motel room was, therefore, lawful.

15

5

*Defendant's Detention After The Detectives Entered The Motel Room Was Lawful*

The People assert the detectives lawfully detained defendant after they entered the motel room and realized defendant was not Kerby because the detectives had a reasonable suspicion defendant had used a stolen or false identification to rent the room. Defendant does not address this argument, apparently conceding the detention was lawful if we conclude defendant was not under arrest when Detective Aguilar knocked on the door. (See *People v. Bouzas* (1991) 53 Cal.3d 467, 480 [People's failure to respond to the defendant's argument constituted an apparent concession on the merits].) We agree with the People.

Detective Roberts testified he questioned defendant about her identity for approximately five minutes after he entered the motel room because he noticed she was not Farnham; he suspected Farnham's driver's license had been stolen and defendant was wanted by the police. Detective Roberts thus pointed to specific articulable facts providing some objective indication defendant may have been involved in identity theft, supporting the short detention to investigate. (*People v. Casares* (2016) 62 Cal.4th 808, 837-838 [detention is reasonable when officer can point to specific articulable facts that, under the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity].)

II

*The Miranda Argument*

Defendant argues the trial court erred in denying the motion to suppress her statements to Detective Roberts in the motel room because the statements were made during a custodial interrogation in the absence of defendant's receiving *Miranda* warnings. She believes the error prejudiced her as to the misdemeanor conviction for giving a false identification to a police officer. The People disagree. The People assert

16

the trial court properly determined defendant's statements were not made during a custodial interrogation. We agree with the People.

A

*Factual Background*

We set forth only the testimony pertinent to our determination on this issue. During the preliminary examination hearing, Detective Roberts testified: He and his partner knocked on a motel room door looking for a woman with a felony warrant. Defendant responded to the knock and the detectives explained they needed to verify her identity. The detectives and defendant communicated through the door for approximately 10 minutes and, when defendant opened the door, Detective Roberts "could immediately tell that she was not the subject [they] were looking for with the felony warrant." He "could also tell that she was obviously not the person who was on the [identification] that was given to rent the room." Detective Roberts testified: "She actually stated that she was afraid of law enforcement. She expressed that to me verbally and indicated that she was a recent victim of domestic violence, that she was fleeing an abusive relationship, and that her either husband or ex-husband was or is a police officer, and that she had used -- admitted to using the false [identification] in order to remain anonymous so that he, essentially, could not find her." Defense counsel objected, arguing no *Miranda* warning had been given. The trial court said it had not "heard any evidence that defendant was under arrest or that this was custodial interrogation." The court asked defense counsel whether he wished to voir dire Detective Roberts; defense counsel said he did.

During voir dire questioning, Detective Roberts explained defendant was not handcuffed during their conversation. Defendant was allowed to walk freely throughout the room and, although there were four officers at the scene, only two officers were in the room speaking with defendant. Detective Roberts explained "most of the conversations took place while [defendant] was in the bathroom, and [his] supervisor was speaking with her." Detective Roberts further testified he did not search the motel room but "did

17

initially check [defendant's] purse for her [identification], but there was no search of the room." He explained the purse "was sitting out in the open, in plain view, on the bed, and [he] peeked in to see if [he] could see her [identification]."

Defense counsel moved to exclude defendant's statements for violating *Miranda*.[4] The prosecution argued, among other things, there was no custodial interrogation because "[o]nce the[ detectives] got into the room, they were simply trying to get to the bottom of who she was, not incriminating her or anything, and the detective even testified that they had confirmed that she wasn't the person they were looking for. They just wanted to figure out who she was." The court found defendant's statements were not given in response to a custodial interrogation and denied the motion.

Defendant asked the trial court to reconsider the ruling prior to trial. The trial court reviewed the preliminary examination hearing transcript and denied the motion, stating it did not "appear there was [a] custodial interrogation."

B

*Detective Roberts's Questioning In The Motel Room Did Not Violate Miranda*

"*Miranda* advisements are required only when a person is subjected to 'custodial interrogation.' " (*People v. Davidson* (2013) 221 Cal.App.4th 966, 970.) "While the term 'interrogation' refers to any words or actions on the part of police that are reasonably likely to elicit an incriminating response, it does not extend to inquiries . . . that are 'essentially "limited to the purpose of identifying a person found under suspicious circumstances or near the scene of a recent crime[.]" ' [Citation.] Likewise, the term 'custody' generally does not include 'a temporary detention for investigation' where an officer detains a person to ask a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's

---

**4**     *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

suspicions." (*People v. Farnam* (2002) 28 Cal.4th 107, 180.) Thus, in sum, "[a] custodial interrogation does not occur where an officer detains a suspect for investigation and the questioning is limited to the purpose of identifying a suspect or 'to obtain [sufficient] information confirming or dispelling the officer's suspicions.' " (*Davidson*, at p. 970.) On appeal, we defer to the trial court's factual findings supported by substantial evidence and independently determine from the factual findings whether defendant was subjected to a custodial interrogation. (*Ibid.*)

Defendant vigorously argues in great depth that "she was in custody for the purposes of *Miranda* when multiple officers questioned her in the bathroom of her motel room." We do not address the argument because, even if we assume defendant was in custody at that time (a question we need not and do not decide), we conclude the second mandatory requirement to trigger *Miranda* -- an interrogation -- did not occur. In that regard, defendant argues "Detective Roberts was looking for a wanted criminal fugitive and had reason to believe that [defendant] was that fugitive." She asserts his questions regarding her identity constituted an interrogation because "[a]ny police officer -- knowing that the suspect is a potential fugitive and that the suspect's identity alone could prove that she had committed a crime -- who then asks the suspect for her identity undeniably knows that the question is 'reasonably likely to elicit an incriminating response.' "

The problem with defendant's argument is that she ignores Detective Roberts's testimony. Detective Roberts testified he immediately knew defendant was not the fugitive after she opened the door -- which occurred before the questioning in the bathroom and elsewhere in the motel room. Thus, the questions regarding defendant's identity after the detectives entered the motel room were not intended to incriminate her as the potential fugitive, as defendant contends. Defendant raises no other argument as to why the questioning in the motel room sought to elicit an incriminatory response from her. We thus affirm the trial court's ruling.

19

### III

*The Sufficiency Of The Evidence To Support The Misdemeanor Conviction*

Defendant asserts there was no evidence presented at trial to show she was detained when she falsely identified herself to Detective Roberts, requiring reversal of the misdemeanor conviction for giving a false identification to a police officer.)

### A

*Trial Testimony*

We summarize only the testimony pertinent to defendant's challenge on appeal.

### 1

*Prosecution*

Detective Roberts and his partner went to a motel on July 18, 2018, because they had received "information earlier in that day that a female subject with a warrant was currently at the motel and was possibly driving a rental car." The person they were looking for was Kerby. When the detectives arrived at the motel, they saw a rental car in the parking lot. The detectives spoke with the motel manager who said the rental car belonged to the woman, Farnham, renting room 213. The motel manager provided Detective Roberts with a copy of Farnham's identification.

Detectives Roberts and Aguilar went to room 213 and knocked on the door. Defendant responded but did not open the door immediately; it took approximately 10 minutes for her to open the door. Upon seeing defendant, Detective Roberts realized she did not match the photograph on Farnham's identification. Detective Roberts asked defendant to identify herself. Defendant replied she was Tanya Charles from Minden, Nevada, and provided a date of birth. Detective Roberts later determined defendant was not Tanya Charles and, under her true identity, defendant had a warrant for her arrest. Farnham testified her driver's license was stolen on July 13, 2018, and she did not give anyone permission to use the license to rent a room at the motel.

20

2

*Defense*

Defendant testified her car, driver's license, and other possessions were stolen at a gas station on July 5, 2018. A woman she met at a bar gave defendant Farnham's driver's license to rent a motel room, telling defendant the license belonged to her daughter. Defendant used the license to rent a motel room and went to bed; she was woken up by a knock on the door. Defendant asked who was at the door and "they identified themselves as the Sheriff's Department." She testified: "They told me that they had a warrant for somebody and that they wanted -- and I told them that, you know, that's not me. And they said well, we need you to open the door so we can see you and verify that you're not the person [who] we have a warrant for." Defendant eventually opened the door and "[t]hen they talked to [her] for a little bit." Detective Roberts said the identification defendant used to check into the room was not hers and asked defendant whether a friend let her use the identification. Defendant said, yes. Detective Roberts then asked why defendant would use someone else's identification. Defendant responded she had been a victim of domestic violence. When Detective Roberts asked defendant for her name, she replied her name was Tanya Charles. The police then left.

During closing argument, defense counsel said defendant was not guilty of identity theft but was guilty of giving false information to a police officer.

B

*The False Identification Conviction Is Supported By Substantial Evidence*

Penal Code[5] section 148.9, subdivision (a), provides in pertinent part that "[a]ny person who falsely represents or identifies himself or herself as another person or as a fictitious person to any peace officer . . . *upon a lawful detention or arrest* of the person,

---

[5] All further section references are to the Penal Code unless otherwise specified.

21

either to evade the process of the court, or to evade the proper identification of the person by the investigating officer is guilty of a misdemeanor." (Italics added.) Defendant argues her false identification conviction must be reversed because "there was no evidence from which the jury could have found that [defendant] was detained at the time she falsely identified herself." We disagree.

The standard for judicial review of a criminal conviction challenged as lacking evidentiary support is well established: "[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "If the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078.) A conviction will not be reversed for insufficient evidence unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Here, defendant's and Detective Roberts's testimony established: the detectives knocked on the motel room door and told defendant they had a warrant for someone and needed to verify defendant's identity; defendant responded "that's not me" but the detectives insisted, stating "we need you to open the door so we can see you and verify that you're not the person that we have a warrant for"; defendant would not open the motel room door for 10 minutes; when defendant finally opened the door, the detectives talked to her "for a little bit" -- in other words, they had not left and were waiting for her to open the door; Detective Roberts said the identification defendant used to check into the room was not hers and asked defendant whether a friend had let her use the identification; after defendant responded "yes" to his question, Detective Roberts

22

continued to question her, asking why defendant would use someone else's identification; defendant responded she had been a victim of domestic violence; Detective Roberts then asked defendant for her name and defendant said her name was Tanya Charles.

From the foregoing testimony, a reasonable trier of fact could find defendant was detained at the time she gave the false information to Detective Roberts. The detectives refused to leave when defendant said she was not the person for whom the warrant had been issued. The detectives lingered and waited 10 minutes for her to open the door. When she opened the door, the detectives asked defendant several questions relating to her using another person's identification to rent the room. These facts, taken together, provide substantial evidence from which the jury could infer defendant was not free to decline the officers' requests (they were insisting on knowing who she was) and she could not terminate the encounter (she tried to get them to leave and they refused). (*In re Manuel G.* (1997) 16 Cal.4th 805, 821 [a consensual encounter turns into a detention when " 'all the circumstances surrounding the encounter [demonstrate] the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter' "].)

Defendant believes the facts in this case mirror the circumstances in *In re Voeurn O.* and *Hughes*, in which the courts found the police-citizen interactions to be consensual. (Citing *In re Voeurn O.* (1995) 35 Cal.App.4th 793, 795; *People v. Hughes* (2002) 27 Cal.4th 287, 328.) In *In re Voeurn O.*, a police officer "was dispatched to an apartment complex to investigate a call concerning 'suspicious juveniles loitering.' [The officer] spotted Voeurn lying on the grass in the middle of the complex and began questioning him. Voeurn said he was waiting for a friend but could not provide the friend's address. He also gave [the officer] a false name and address and denied being in a gang. Voeurn was released and arrested three weeks later when the police discovered his true identity." (*In re Voeurn O.*, at p. 795.) In *Hughes*, an officer approached the defendant outside an apartment building, "inquired whether [the defendant] could assist him, and posed basic

23

and preliminary questions to establish whether [the] defendant might possess information concerning the crime." (*Hughes*, at p. 328.) "The conversation was nonaccusatory, routine, and brief, and would not have caused a reasonable person to believe that his or her liberty was being restrained." (*Ibid.*) We find neither case analogous to the facts established by the testimony in this case.

Because we do not conclude defense counsel's concession during closing argument that defendant was guilty of false identification provided substantial evidence to support the verdict, we do not address defendant's argument that the concession constituted ineffective assistance of counsel.

## IV

### *The Prior Strike Allegation*

### A

### *The Evidence And Hearing*

Defendant pled guilty to and was convicted of second degree robbery in Washington in 2014. In this matter, defendant waived a jury trial and filed a motion to strike the prior strike allegation pertaining to the 2014 Washington conviction. Defendant asserted the record of conviction failed to show beyond a reasonable doubt that the underlying Washington offense met all of the elements of the California robbery statute. The prosecution opposed the motion, arguing the "affidavit of facts" (a statement by the investigating officer) included in the record of conviction established the Washington offense met all of the elements for robbery in California when coupled with defendant's agreement on the plea form that "the court may review the police reports and/or a statement of probable cause supplied by the prosecution to establish a factual basis for the plea."

The trial court discussed in detail the various documents submitted regarding the Washington conviction. It found "[t]he affidavit[ of facts] clearly establishes facts which satisfy all of the elements of California's statute of [a section] 211 robbery." The trial

24

court further noted that, in the plea agreement, "the defendant agreed that instead of making a statement I agree that the Court may review the police reports and/or a statement of probable cause supplied by the prosecution to establish a factual basis for the plea," and the Washington judge had found a factual basis for the plea. The court denied defendant's motion to strike.

B

*The Prior Strike Finding Must Be Reversed*

"A prior conviction in another jurisdiction for an offense that, if committed in California, is punishable by imprisonment in the state prison constitutes a prior conviction of a particular serious or violent felony if the prior conviction in the other jurisdiction is for an offense that includes all of the elements of the particular violent felony as defined in subdivision (c) of Section 667.5 or serious felony as defined in subdivision (c) of Section 1192.7." (§ 1170.12, subd. (b)(2).)  Robbery is a serious felony under California law. (§ 1192.7, subd. (c)(19).)  Thus, if a defendant's prior robbery conviction in another state qualifies as a strike, he or she is subject to a doubled term for his or her current offense. (§ 1170.12, subd. (c)(1).)

"To qualify as a serious felony, a conviction from another jurisdiction must involve conduct that would qualify as a serious felony in California." (*People v. Avery* (2002) 27 Cal.4th 49, 53.)  " '[I]n determining the truth of an alleged prior conviction when . . . the necessary elements of that conviction do not establish that it is a serious felony, and thus subject to California's Three Strikes law, the trier of fact must decide whether the defendant's conduct, as demonstrated in the record of the prior conviction, shows that the crime was a serious felony.' " (*People v. Gallardo*, *supra*, 4 Cal.5th at p. 135.)  In that regard, "[t]he trial court's role is limited to determining the facts that were necessarily found in the course of entering the conviction.  To do more is to engage in 'judicial factfinding that goes far beyond the recognition of a prior conviction.' " (*Id.* at p. 134.)

25

As the People appropriately concede, Washington's robbery statute is broader than California's robbery statute. (Compare § 211 with Rev. Code of Wash., § 9A.56.190.) For example, Washington does not require the prosecution to prove intent to permanently deprive another of his or her property (*State v. Komok* (Wash. 1989) 783 P.2d 1061, 1064), whereas California requires the prosecution to prove intent to permanently deprive another of his or her property (*People v. Anderson* (2011) 51 Cal.4th 989, 1002). The trial court thus had to decide whether defendant's conduct, as demonstrated in the record of the prior conviction, showed the Washington robbery conviction involved conduct that would qualify as a serious felony in California. (*People v. Gallardo*, *supra*, 4 Cal.5th at p. 135.)

We agree with the People that, in relying on the affidavit of facts form as the factual basis for defendant's guilty plea, the trial court engaged in the sort of disputed determination prohibited by *Gallardo*. On her plea form, defendant agreed "the court may review the police reports and/or a statement of probable cause supplied by the prosecution to establish a factual basis for the plea." The plea form did not reference the affidavit of facts or provide that defendant agreed to admit the facts contained in the affidavit of facts. Although the Washington court found a factual basis for the plea, nothing in the record discloses what the Washington court relied upon in reaching that conclusion. Consequently, the trial court's true finding must be reversed.

"We note, however, that reversal of a true finding on a prior conviction allegation does not prevent retrial of that enhancement. [Citation.] As explained in *Gallardo*, the appropriate remedy is to remand the case to the trial court for a new hearing on the prior strike allegation 'to permit the People to demonstrate to the trial court, based on the record of the prior plea proceedings, that defendant's guilty plea encompassed a relevant admission about the nature of [her] crime.' [Citation.] Upon remand, the prosecution may be able to provide a reporter's transcript of the . . . plea proceedings or other documentation not previously provided, which may shed light on whether defendant

26

admitted any additional facts as part of h[er] guilty plea." (*People v. Strike* (2020) 45 Cal.App.5th 143, 154.)

## DISPOSITION

The trial court's true finding regarding the prior strike allegation is reversed. We remand the matter for retrial of the prior strike allegation and/or resentencing. In all other respects, the judgment is affirmed.

/s/
Robie, J.

We concur:

/s/
Blease, Acting P. J.

/s/
Murray, J.