*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# S T A T E   O F   M I C H I G A N

# C O U R T   O F   A P P E A L S

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

NEIL ANDREW TRAPP,

        Defendant-Appellant.

FOR PUBLICATION
December 17, 2020
9:15 a.m.

No. 345293
Macomb Circuit Court
LC No. 2017-004415-FH

Before: SWARTZLE, P.J., and BECKERING and GLEICHER, JJ.

GLEICHER, J.

Four uniformed police officers responded to a call from a trailer park reporting "[a] man with a gun" on the premises. When the police arrived, the night scene was quiet with no gunman in sight. The trailer park manager told the officers that the man was inside a nearby trailer.

The police ordered the males in the trailer to come outside with their hands visible. Defendant Neil Trapp complied and within minutes was spun around and handcuffed. Trapp resisted; his efforts resulted in a felony charge. We are tasked with deciding whether Trapp's seizure resulted from a constructive entry conducted in violation of the Fourth Amendment. If it did, the common law permitted Trapp to physically oppose and obstruct his arrest.

The police were entitled to investigate whether Trapp presented a danger to the trailer park. But absent a warrant, they could not invade the trailer to seize or search him. The Fourth Amendment likewise prohibited the police from evading the warrant requirement by deliberately coercing Trapp to exit the trailer. Trapp was not subject to arrest before he resisted, and exigent circumstances did not exist to excuse the police officers' conduct. We reverse Trapp's conviction for resisting and obstructing a police officer and remand for further proceedings.

I

The facts surrounding the events at issue are confined to the brief preliminary examination testimony of one of the involved police officers and a grainy, dark dash cam video.

Warren police officer Christopher Wells testified that four uniformed officers were dispatched to a trailer park for "[a] man with a gun complaint." The officers arrived at the scene at 10:36 p.m. No people were in sight as the police drove into the trailer park. The manager approached the officers and told them that there were several intoxicated people in "trailer number six," and that one had a firearm. Gesturing to a different trailer, the manager stated, "I've got this family over here with kids."

The manager described the man with the firearm as "drunker than hell, pulling his gun out" from the back of his pants, shirtless and "full of tattoos." He stated that there were "a whole group of kids in there," gesturing toward trailer number six, and declared, "I want 'em all out of my park." The manager and the officers discussed whether the people in trailer number six actually lived in the trailer or were "trespassers"; some of the conversation is inaudible or garbled. The manager claimed that only a woman lived in the trailer.[1]

The video shows what happened next. The dashboard camera was aimed in the direction of the police car's travel into the park. The manager had emerged from the left side of the road. Trailer number six was across the road, on the right. The shorter dimension of trailer number six (the width end) faced the road. This portion of the trailer had a lit window, but no door.

After being briefed by the trailer park manager, four officers approached trailer number six. Their object was the trailer door located on the long side of the trailer, which ran perpendicular to the road. Because the camera remained in the parked police car and pointed straight down the road, it did not capture the trailer door or its threshold. Several features of the trailer are nonetheless apparent.

Two or three small steps led to a landing which appears to wrap around the trailer from the side facing the road. The steps and part of the landing are partially visible in the video, but the door and the threshold are not. The straight-ahead camera angle makes it impossible to visualize

---

[1] The prosecution has never taken the position that Trapp lacked an expectation of privacy in the trailer, and no facts of record would support such a finding. Our concurring colleague questions whether Trapp had standing to challenge his arrest, but that issue was not raised by the prosecution in the trial court, or in this Court when the case first presented itself here, or in the Supreme Court when the case landed there, or in this Court on remand. Likely the prosecution did not raise it on any of these occasions because the prosecution knew that if Trapp was an overnight guest in the trailer, he had a reasonable expectation of privacy. *Minnesota v Olson*, 495 US 91, 96-97; 110 S Ct 1684; 109 L Ed 2d 85 (1990). Regardless, it is too late now to consider Trapp's standing. See *Steagald v United States*, 451 US 204, 209; 101 S Ct 1642; 68 L Ed 2d 38 (1981) ("[T]he Government was initially entitled to defend against petitioner's charge of an unlawful search by asserting that petitioner lacked a reasonable expectation of privacy in the searched home, or that he consented to the search, or that exigent circumstances justified the entry. The Government, however, may lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or when it has failed to raise such questions in a timely fashion during the litigation.").

the occupants of the trailer before they exited the residence and, in Trapp's case, descended the steps.

One of the four officers mounted the steps and knocked on the trailer door. When a woman answered, the officer shined a flashlight in her direction. The officer asked her who was in the trailer with her, and she identified the occupants as her brother, her stepbrother, and her two "best friends." The officer stated, "Step out here." The woman complied. The officer then asked, "How many kids are in there?" The woman responded that there were no children present other than her 16-year-old son. The woman is never visible in the video.

The officer then declared, "Have the two males step . . . out one at a time with their hands where we can see 'em." Regarding this command, Officer Wells testified as follows:

> *Q.* When you arrived on scene was Mr. Trapp indoors or outdoors?
>
> *A.* Indoors.
>
> *Q.* And the officers ordered him outdoors to talk to him?
>
> *A.* I'm sorry?
>
> *Q.* Officers ordered him to come outdoors to talk to them?
>
> *A.* Everyone in the trailer number six, yes.

Trapp exited the trailer and an officer pointed a second light in Trapp's direction. Two or more additional uniformed officers positioned themselves near the trailer door.[2] Immediately after Trapp exited the trailer, one of the officers took Trapp's arm and pulled him toward a parked car, instructing Trapp to "go to that officer over there." Trapp obeyed, commenting "holy shit there's a lot of you" as he moved away from the trailer. He stood facing the trailer with his back to the parked car as he answered the officer's questions. The interrogating officer stood between Trapp and the door to the trailer.

Trapp's answers to the officer's questions exposed Trapp's obvious inebriation. When asked, "What's going on?," Trapp referred to his "company" (presumably houseguests) and began to pivot back toward the trailer. An officer blocked Trapp's path and appears to slightly propel Trapp back toward the patrol car. The officer asked Trapp whether he had "come out here with a gun," and Trapp emphatically replied, "No, hell no!" The officer inquired whether Trapp had his identification on him; Trapp replied affirmatively and the officer asked to see it. Although it is difficult to discern, Trapp either produced his identification by reaching into a pants pocket or attempted to do so.

---

[2] The district court counted nine officers "in view of the camera" when Trapp was being questioned. After the officers threatened to "spray" Trapp, one of them stated, "There are like nine of us here, you're not going to win this fight."

Trapp volunteered that his handgun was registered "to myself." He asked, "What is it with the handgun?," and an officer told him that there had been "a complaint." Trapp expressed that he was "lost" about "the whole handgun thing," and an officer sardonically inquired whether he was "lost" about having "run out here" waving the handgun, with no shirt on. Did someone just "make up" that information, the officer queried. Trapp launched into a monologue about "guys" who had been there that evening. He volunteered, "I'd never pull anything on anyone period." An officer asked if he had "a gun here tonight," and Trapp answered, "Do I have a handgun?" He told the officers that his gun was "legal" and in his car. The officer again inquired where the gun was, and Trapp responded by asking the officer whether he had "a warrant." The officer replied, "I'm asking you where it is." Trapp asked for a second time whether the police had a warrant. When the officer repeated the same question a third time, Trapp responded, "All I asked you is there a warrant?"

The officer forcefully pushed Trapp against the parked car and ordered him to "turn around." Trapp resisted and a struggle ensued. The officers quickly subdued Trapp. They forced him to the ground, handcuffed him, threatened to "spray" him, and placed him in a police cruiser. The prosecutor charged Trapp with two counts of resisting or obstructing a police officer, MCL 750.81d, one count of brandishing a firearm, MCL 750.234e, and one count of disturbing the peace.

At the preliminary exam, Officer Wells explained that the questioning regarding the handgun was directed to Trapp because Trapp wore blue jeans and a white shirt and had tattoos; the other male wore black jeans and a black shirt. The testimony continued as follows:

> *Q*. So what . . . I'm asking you is why were you asking where his gun was at? Who cares?

> \* \* \*

> *The Witness*: Because we were there for a man with a gun complaint.

> *Q*. Is that a crime?

> *A*. Yeah.

> *Q*. What's the crime?

> *A*. He's waiving [sic] a gun around, he's intoxicated.

> *Q*. So brandishing a firearm?

> *A*. Yeah.

Defense counsel moved to quash the felony information, contending that Trapp had rightfully resisted an unlawful arrest. The arrest was unlawful, counsel reasoned, because Officer Wells claimed to have arrested defendant for brandishing a firearm, but under MCL 764.15, the police did not have authority to arrest him for that offense. The district court denied the motion and bound Trapp over for trial, finding that under *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed

-4-

2d 889 (1968), the officers had reasonable suspicion to believe that Trapp was armed and dangerous.

Trapp renewed his motion in the circuit court, asserting that the district court improperly relied upon *Terry* when it determined that his interaction with the police officers had resulted in a lawful arrest. Trapp urged that *Terry* only applies to *public* interactions, and he was not in a public place when the police officers told him to exit the trailer. Trapp was unlawfully arrested, counsel urged, because he left the trailer only when the police ordered him to do so.

The circuit court denied Trapp's motion, finding the interaction lawful under *Terry* and that Trapp had exited the trailer voluntarily. The circuit court wrote: "It is undisputed defendant voluntarily exited his home upon the request of law enforcement." The court's opinion continued: "Officer Wells'[s] testimony clearly demonstrates officers initially instructed defendant to turn around and place his hands behind his back so they could search his person for a gun. There is no evidence defendant was under arrest at this point in time." And like the district court, the circuit court opined that the police had reasonable suspicion to believe that Trapp was armed and dangerous. Trapp "was truly resisting the officers' attempt to execute a *Terry* search," the court found, and was legally arrested because he was resisting. The court denied reconsideration, noting that Trapp's motion was based on the doctrine of constructive entry. The officers did not engage in coercive conduct, the circuit court determined, because they requested that defendant exit the trailer only a single time.

Trapp entered a conditional plea of nolo contendere under MCR 6.301(C)(2) and reserved his right to withdraw the plea in the event that he successfully challenged the denial of his motion to quash. Pursuant to a *Cobbs*[3] agreement, he was sentenced to 12 months' probation.

This Court denied Trapp's application for leave to appeal. *People v Trapp*, unpublished order of the Court of Appeals, entered February 25, 2019 (Docket No. 345293). In lieu of granting leave to appeal, the Supreme Court remanded the case to this Court for consideration as on leave granted, ordering us to address the following:

> (1) whether the constructive-entry doctrine, *United States v Morgan*, 743 F2d 1158 (CA 6, 1984), should be recognized in Michigan and, if so, whether the facts of this case fall within that doctrine; and (2) whether the dispatch report that the police received about an intoxicated man waving a gun around outside a trailer, and the video evidence showing that the police received information when they arrived at the scene about children being present, provided the police with exigent circumstances justifying their action of telling one occupant of the trailer to tell the other occupants to come out. [*People v Trapp*, 504 Mich 979 (2019).]

## II

Our task is to place in a legal framework the events of the three minutes that transpired from the officers' arrival at trailer number six until Trapp's act of resistance. Trapp claims he was

---

[3] *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

arrested by the officers when he was ordered to leave the trailer; the circuit court found that he had voluntarily exited and was merely "seized" pursuant to a *Terry* stop. The video shows and tells us what happened. Because we have watched the video, we need not rely exclusively on the circuit court's factual conclusions. See *People v Kavanaugh*, 320 Mich App 293, 298; 907 NW2d 845 (2017).

When the officers arrived at the scene, there was no evident emergency. The trailer park was dark and quiet. Even though it was nighttime, we assume that the officers were justified in performing a "knock and talk" to investigate whether an armed and dangerous man had taken refuge in trailer number six and might reemerge to threaten the park's tranquility.[4] Had the officers started and ended by gathering information at the trailer's entryway, the Fourth Amendment would not have been implicated at all. *People v Frederick*, 500 Mich 228, 241; 895 NW2d 541 (2017).

But the officers exceeded the permissible scope of an investigative "knock and talk" when they ordered the woman to "step out here." Fourth Amendment activity commenced with this command and continued when the officers instructed the woman to tell the males to exit the trailer. Both orders resulted in seizures implicating the Fourth Amendment. And as we discuss in greater detail below, by ordering the woman and the men to leave the trailer, the officers constructively entered the trailer without a warrant.

Two additional points bear mention. When the police officers arrived at the trailer park, they lacked probable cause to arrest Trapp for anything. Probable cause requires *individualized* suspicion. "A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." *Indianapolis v Edmond*, 531 US 32, 37; 121 S Ct 447; 148 L Ed 2d 333 (2000). Until the police ordered the men out of the trailer, they had no reason to suspect Trapp of having committed a crime.

Further, even assuming that legally gathered information identified Trapp as the person who "pull[ed] his gun out," Michigan law prohibited the officers from arresting Trapp for brandishing a firearm. Knowingly brandishing a firearm in public is a misdemeanor "punishable by imprisonment for not more than 90 days[.]" MCL 750.234e(3). Under MCL 764.15(1)(a), an officer lacking a warrant may arrest a person for a felony or a misdemeanor committed in the officer's presence, or under MCL 764.15(1)(d), if the officer "has reasonable cause to believe a misdemeanor punishable by imprisonment for more than 92 days . . . has been committed and reasonable cause to believe the person committed it."[5] Trapp was not subject to arrest for anything he had done before the police arrived.

---

[4] Unlike in *People v Frederick*, 500 Mich 228, 240; 895 NW2d 541 (2017), the events in this case played out before 11:00 p.m. and not "the middle of the night." A light was on in the trailer when the officers arrived, and the video evidence supports that no one was asleep. The officers were justified in approaching the trailer to gather information about what had transpired regarding the armed man who had been brandishing a gun on the trailer park premises.

[5] The prosecution's brief on appeal suggests that the police had probable cause to arrest Trapp for "felonious assault." The facts reported by the trailer park manager do not support that anyone was

A

The Michigan Supreme Court first addressed the constructive entry doctrine in *People v Gillam*, 479 Mich 253; 734 NW2d 585 (2007), but the majority did not reach a conclusion regarding its general applicability. *Gillam* supplies our standard of review:

> The scope of the constructive entry doctrine and whether the police conduct . . . constituted a constructive entry of defendant's dwelling raises Fourth Amendment implications. Issues of constitutional dimension are reviewed de novo. A trial court's factual findings are generally reviewed for clear error. [*Id.* at 260 (citations omitted).]

B

Because they had no warrant and no exceptions to the warrant requirement apply, the officers could not have entered trailer number six to seize any of its occupants for questioning, or to search for a weapon. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v New York*, 445 US 573, 590; 100 S Ct 1371; 63 L Ed 2d 639 (1980). Indeed, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[.]" *United States v US Dist Court for the Eastern Dist of Mich*, 407 US 297, 313; 92 S Ct 2125; 32 L Ed 2d 752 (1972). The warrantless physical invasion of a home, "by even a fraction of an inch" contravenes the Fourth Amendment. *Kyllo v United States*, 533 US 27, 37; 121 S Ct 2038; 150 L Ed 2d 94 (2001) (quotation marks and citation omitted). At the Fourth Amendment's "very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Florida v Jardines*, 569 US 1, 6; 133 S Ct 1409; 185 L Ed 2d 495 (2013) (quotation marks and citation omitted). Our Supreme Court recently emphasized that "[e]ven when based on probable cause, . . . a warrantless search or seizure inside a suspect's home is presumptively unreasonable." *People v Hammerlund*, 504 Mich 442, 452; 939 NW2d 129 (2019).

Rather than entering the trailer, the officers began their investigation by ordering the female occupant to step outside. The officer issued this order under the color of his authority as a police officer. The woman was not given the option of staying inside or asked whether she wished to cooperate. Because the police lacked any reasonable suspicion that the woman had committed or was about to commit a crime, they had no authority to seize her by telling her to "step outside." Once divested of the safety and security of her home, the woman was instructed to tell the males to come outside with their hands positioned so that they would be visible to the officers. The woman complied.

We cannot accept the trial court's characterization of Trapp's exit pursuant to the officer's directions, filtered through the woman, as "voluntary." At least four armed uniformed officers had

---

assaulted, nor do any other record facts. Officer Wells testified that the crime under investigation was brandishing a firearm. Neither he nor the prosecutor who handled the preliminary exam mentioned an assault.

surrounded the trailer at night, extracted the woman who lived there, and ordered the men to present themselves outside with their hands visible. Officer Wells had no difficulty in agreeing with counsel's characterization of the officer's communication to the men in the trailer as an "order." The video supports that the "order" and accompanying circumstances had the features of a coercive seizure:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [*United States v Mendenhall*, 446 US 544, 554; 100 S Ct 1870; 64 L Ed 2d 497 (1980).]

Given the presence of four or more armed officers around the trailer's entrance at night combined with the language and tone of the involved officer's voice, a reasonable person in Trapp's position would not have felt free to ignore the officer's instruction and simply close the door.

But we need not linger on whether Trapp was "seized" in a legal sense before he stepped out of the trailer, as the video makes it clear that he was *physically* seized a second or two later, when an officer pulled him from the landing and propelled him toward the parked car. There was nothing voluntary about Trapp's movement away from the trailer. And without question, at that point Trapp was not free to leave.

Did the actions of the police officers conform to the Fourth Amendment? For two reasons, we hold that they did not. First, the police conducted an illegal constructive entry of the trailer by ordering its occupants outside. In answer to the Supreme Court's inquiries on this subject, we hold that the constructive entry doctrine as described in *United States v Morgan*, 743 F2d 1158 (CA 6, 1984), should be adopted, and that the facts of this case fall within that doctrine. Second, the police formally arrested Trapp when he repeatedly asked if they had a warrant. That arrest was without probable cause. Accordingly, Trapp had a common-law right to resist, *People v Moreno*, 491 Mich 38, 41; 814 NW2d 624 (2012), and his conviction for resisting and obstructing an officer should have been quashed.

C

We begin by discussing the constructive entry doctrine and, in particular, the Sixth Circuit case brought to our attention by the Michigan Supreme Court: *United States v Morgan*, 743 F2d 1158 (CA 6, 1984). The constructive entry paradigm flows from the United States Supreme Court's holding in *Payton v New York* that absent exigent circumstances, the police may not enter a home to effect an arrest unless armed with a warrant. *Payton*, 445 US at 590. Courts adopting the doctrine hold that when the police coerce the residents of a home to leave so that they are readily subject to arrest similarly contravenes *Payton*. *Morgan* provides a classic example.

The police suspected John Henry Morgan of having shot automatic weapons in a public park and of possessing illegal guns. *Morgan*, 743 F2d at 1160. Officers followed Morgan's car to his mother's residence, where an officer saw several people "take an assortment of weapons into the Morgan home." *Id*. At least nine officers surrounded the house, flooded it with spotlights,

and "summoned Morgan from his mother's home with the blaring call of a bullhorn." *Id*. at 1161. Morgan appeared at the front door with a pistol in his hand. He was ordered to put the gun down and did so. When he stepped outside, Morgan was formally arrested. *Id*.

The Sixth Circuit held that "[v]iewed objectively," Morgan was arrested without a warrant "at the moment the police encircled the Morgan residence." *Id*. at 1164. The arrest violated *Payton*, the Court held, because no warrant had been obtained and "[t]he police show of force and authority was such that a 'reasonable person would have believed he was not free to leave.'" *Id*., quoting *Mendenhall*, 446 US at 554. The Court elaborated:

> Nine police officers and several patrol cars approached and surrounded the Morgan residence in the dark. The officer in charge strategically positioned his car in the driveway in front of the Morgan home blocking any movement of his car. The police then called for Morgan to come out of the house. These circumstances surely amount to a show of official authority such that a reasonable person would have believed he was not free to leave. Viewed objectively, Morgan was placed under arrest, without the issuance of a warrant, at the moment the police encircled the Morgan residence. [*Morgan*, 743 F2d at 1164 (quotation marks and citations omitted).]

The Sixth Circuit characterized the events leading to Morgan's arrest as a "constructive entry" that "accomplished the same thing" as a warrantless arrest. *Id*. at 1166. In adopting this doctrinal concept, the Court stressed that "[a] contrary rule would undermine the constitutional precepts emphasized in *Payton*." *Id*. That reasoning undergirds our recommendation that the constructive entry doctrine be recognized in Michigan.

Also relevant here, the Sixth Circuit forcefully rejected the government's argument that Morgan's arrest was constitutionally permissible because it followed a "brief investigatory stop" sanctioned by *Terry*. Morgan posed a threat to the officers when he appeared armed at the doorway, the government contended, permitting the officers to perform a "cursory safety check" that developed into an arrest. *Id*. at 1162-1163. The Sixth Circuit disagreed, noting that Morgan presented no danger to the police or anyone else until the police surrounded his home. *Id*. at 1163. "Police officials . . . are not free to create exigent circumstances to justify their warrantless intrusions," the Court reasoned, removing the case from *Terry*'s ambit. *Id*.

The Sixth Circuit again applied the constructive entry doctrine in *United States v Saari*, 272 F3d 804 (CA 6, 2001). There, the police responded to a call reporting "shots fired" at the home of Saari's ex-wife. Before arriving at the home, however, the officers determined that the shots had not actually been fired. *Id*. at 806. Rather, Saari was seen standing in the window "with what appeared to be a pistol in his hand." *Id*. The ex-wife told the police that Saari "was armed at all times." *Id*. Another source informed the officers that Saari possessed explosives, belonged to a militia group, and was "heavily armed." *Id*.

Four officers deployed to Saari's second-floor apartment. Two positioned themselves on a landing outside Saari's front door; another held a shotgun in a "low ready position," and yet another held a service weapon. *Id*. (quotation marks omitted). The officers "knocked forcefully" on the apartment door and identified themselves as police officers. *Id*. at 807. With their weapons

pointed at the defendant, the officers ordered him to emerge.  When he did so, he was arrested.  Saari moved to suppress evidence of illegal weapons found in the apartment.  *Id*.

The government argued that the officers were "merely attempting to interview Defendant in furtherance of the investigation" and that they reasonably protected themselves by drawing their weapons.  *Id*.  Further, the government contended, Saari "voluntarily exposed himself to the public by opening his door to the police."  *Id*.  The district court determined "that as a practical matter," Saari "was under arrest from the inception of his encounter with the officers."  *Id*. at 808 (quotation marks omitted).  The Sixth Circuit affirmed, finding the case "in all relevant respects . . . indistinguishable from *Morgan*[.]"  *Id*.  In both cases, the officers "summoned" the defendants to exit their homes by employing a "show of authority" with which the defendants reasonably believed they had to comply.  *Id*. at 809.  As in *Morgan*, the police constructively entered Saari's home and accomplished a warrantless arrest.  *Id*.

*Saari* echoes *Morgan*'s rejection of the government's contention that "the officers were . . . simply conducting an investigative stop."  *Id*.  The Court held in *Saari* that officers had conducted "a constructive entry and in-home arrest rather than an investigatory stop," pointing out that *Payton* applied "regardless of whether the officers at issue were conducting an arrest or an investigatory detention."  *Id*.  The Court cogently elucidated the flaws in the government's analogy to *Terry*, as follows:

> [I]f the Court accepted the Government's legal argument, it would have the effect of providing lesser protection to individuals in their homes when the police do not have probable cause to arrest.  It would defy reason to hold, as the Government suggests, that a warrantless in-home seizure is authorized to further an investigation, but that either a warrant or exigent circumstances are necessary when officers have the probable cause and intent to arrest.

> Furthermore, contrary to the Government's argument, summoning a person out of his or her home in the manner described in this case cannot be characterized as an investigative stop.  The *Terry* court authorized a departure from the usual warrant procedures when, unlike the circumstances of this case, the police are responding to their own on-the-spot observations. . . .  Here, the police did not observe Defendant doing anything suspicious.  [*Id*. at 809-810.]

In Trapp's case, the prosecutor draws our attention to *United States v Thomas*, 430 F3d 274 (CA 6, 2005), in which the Sixth Circuit held that a constructive entry had *not* occurred.  The facts of this case mirror those in *Thomas*, the prosecution insists.  But in *Thomas*, the district court found that the police officers had "asked" the defendant to come out of a home, and that "[n]o testimony . . . indicate[d] drawn weapons, raised voices, or coercive demands on the part of the police."  *Id*. at 278 (quotation marks omitted, ellipsis in original).  The Sixth Circuit rejected that a constructive entry had occurred, noting, "Thomas responded to a simple knock and request, not an order to emerge or the threat of firearms."  *Id*.

Unlike in *Thomas*, we have testimony from an officer on the scene affirming that Trapp was "ordered" out of the trailer.  Moreover, the video evidence substantiates that the scene was intensely coercive.  At least four uniformed and armed officers surrounded a small trailer home at

night and began the encounter by ordering the only woman present to come outside. The tone of voice readily audible in the video supports that the officer did not politely invite the woman to exit or merely suggest that the men emerge "with their hands where we can see 'em"; he demanded that they do so. "Opening the door to one's home is not voluntary if ordered to do so under color of authority." *United States v Reeves*, 524 F3d 1161, 1167 (CA 10, 2008). We do not discern anything in the interaction at the trailer supporting that the police gave Trapp a choice about coming outside. A reasonable person in Trapp's position would have concluded that the officer's order was, as Officers Wells testified, an order. The circuit court's conclusion that Trapp exited voluntarily is simply unsupportable on this record.

The Fourth Amendment safeguards the "right of the people to be secure . . . in their houses . . . against unreasonable searches and seizures." The constructive entry doctrine hinges on the notion that the "security" promised by the Fourth Amendment is destroyed not only by a physical invasion of government actors, but also by official conduct calculated to compel the occupants of a home to submit to their own extraction. "[T]he desire to enjoy the privacy of the home is manifested by staying inside, rather than leaving that home." Dow, *Muddling Through the Problem of Constructive Entry: Comments on United States v Allen*, *813 F3d 76 (2d Cir 2016), and Warrantless Doorway Arrests*, 79 U Pitt L Rev 243, 258 (2017). While determining whether a suspect has been "seized" depends in part on whether the suspect felt free to leave, Professor Dow summarizes that "a seizure in a home is interference with one's freedom to stay." *Id*.

Trapp and the other occupants of the trailer were not at liberty to simply ignore the police presence and stay inside. We are persuaded by the Sixth Circuit's decision in *Morgan* that absent a warrant, *Payton* prohibited the police from either entering the trailer or coercively forcing its inhabitants to abandon the security of the residence and expose themselves to a public arrest.[6]

D

The circuit court rejected that Trapp was under arrest when he resisted the officers, finding instead that he had unlawfully resisted a *Terry* stop. The circuit court's reasoning is inapt for two reasons.

First, since *Payton* does not contemplate a warrantless in-home arrest, we cannot fathom why it would be constitutionally permissible for the police to coerce someone from his home to perform an investigative seizure. Second, even were we to reject the constructive entry doctrine, we would have no difficulty concluding that Trapp was unreasonably seized by the officers shortly after he stepped outside the trailer door. The video documents that the officer conducting the questioning physically moved Trapp away from the trailer and into the nearby parking area. This conduct went far beyond *Terry* and into the realm of an arrest. But for the purpose of ascertaining whether Trapp was entitled to resist the officers, what matters is whether the detention was unreasonable, and not whether, post-*Terry*, we deem it an "arrest."

---

[6] Courts other than the Sixth Circuit have explicitly adopted the constructive entry doctrine. See *United States v Maez*, 872 F2d 1444, 1451 (CA 10, 1989); *United States v Al-Azzawy*, 784 F2d 890, 892 (CA 9, 1985); *State v Dahl*, 323 Ore 199; 915 P2d 979 (1996).

The backdrop for our discussion is the "well-established" common-law right to resist not only an unlawful arrest, but "other *unlawful* invasions of private rights." *Moreno*, 491 Mich at 46-47. Michigan's recognition of this right traces back to 1888, when the Supreme Court described that "a debtor" whose "only team, wagon, and harness, worth less than $250" had been unjustly seized by the sheriff was not "compelled to submit to such trespass without reasonable resistance." *People v Clements*, 68 Mich 655, 658; 36 NW 792 (1888). Without such protection, the Court admonished, "every poor debtor would be at the mercy of the sheriff and constabulary of the county, and the statutory benefits intended by the exemption would be of little avail. No officer can be legally authorized to invade private rights in any such manner." *Id.*

In addition to the right to resist the illegal seizure of property, the common law explicitly recognized the right to resist an unlawful arrest. See *People v Krum*, 374 Mich 356, 361; 132 NW2d 69 (1965) ("While one may use such reasonable force as is necessary to prevent an illegal attachment and to resist an illegal arrest, the basis for such preventive or resistive action is the illegality of an officer's action, to which defendant immediately reacts."); *People v De Meaux*, 194 Mich 18, 28; 160 NW 634 (1916) ("He was in his own home when the effort was made to serve the warrant upon him, and if the officer was not armed with a good and sufficient warrant he had the right to order him out of the house and to use all the force reasonably necessary to put him out if he did not go."). In *Moreno*, the Supreme Court acknowledged this strand of the common law, and held that courts must apply it. *Moreno*, 491 Mich at 58.

*Terry* stops were unknown to the common law, of course. As *Moreno* instructs, the common law focused on "invasions of privacy" rather than technical distinctions between arrests and other forms of seizure. *Id.* at 46-47. As the above-quoted caselaw demonstrates, the common-law right to resist the unlawful taking of one's *property* also encompasses the right to resist the unlawful taking of one's *liberty*. That is why we need not embark on a protracted analysis of whether Trapp was arrested or merely "seized" under *Terry*. The point is that the seizure, whatever its label, was unreasonable.

*Terry* contemplated only a limited intrusion—a pat-down for weapons—based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 US at 21. A *Terry* stop and inquiry permit a limited seizure "reasonably related in scope to the justification for [its] initiation." *Id.* at 29. "*Terry* itself involved a limited, on-the-street frisk for weapons." *Dunaway v New York*, 442 US 200, 210; 99 S Ct 2248; 60 L Ed 2d 824 (1979). The United States Supreme Court has repeatedly emphasized that *Terry*'s "scope" is "narrow." *Id.* It is precisely because a *Terry* stop is relatively nonintrusive that probable cause for an investigative detention is not required. *Id.* at 210-211.

Most of the Supreme Court's *Terry* jurisprudence involves situations markedly different than this one—on-the-street encounters prompted by on-the-spot observations. In such circumstances, officers ask questions and use the answers to determine whether further investigation is needed. "The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." *Florida v Royer*, 460 US 491, 497-498; 103 S Ct 1319; 75 L Ed 2d 229 (1983) (citation omitted). Here, Trapp obeyed the officers' directions, made no threatening moves or gestures, and answered the officer's questions

until he decided that unless the police had a warrant, he was finished with the discussion. Nothing about the encounter suggested that Trapp posed a danger necessitating the invasive force that followed Trapp's inquiries about a warrant.

"Admittedly, *Terry*, *Dunaway*, *Royer*, and *Place*, considered together, may in some instances create difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest." *United States v Sharpe*, 470 US 675, 685; 105 S Ct 1568; 84 L Ed 2d 605 (1985).[7] Here, however, the video and the testimony establish that Trapp's seizure, however designated, was unreasonable. Until he was spun around and handcuffed, the officers made no effort to pat Trapp down, despite having pulled from the landing and then restricting his movement when he attempted to walk back in the trailer's direction. It appears that the officers allowed him to reach into his pants to pull out his wallet. The legal basis for detaining Trapp, at that point, eludes us.

The "constitutional validity" of an arrest

depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [defendant] had committed or was committing an offense. [*Beck v State of Ohio*, 379 US 89, 91; 85 S Ct 223; 13 L Ed 2d 142 (1964).]

See also *People v Champion*, 452 Mich 92, 115; 549 NW2d 849 (1996). If the officers' conduct had been consistent with a *Terry* stop at its outset—a proposition with which we disagree—it devolved into an arrest lacking probable cause triggered Trapp's "warrant" questions. Accordingly, Trapp had a common-law right to resist.

III

The Supreme Court directed us to additionally consider whether exigent circumstances, specifically, information relayed by the trailer park manager about "children" being present on the park premises, justified the officer "telling one occupant of the trailer to tell the other occupants to come out." The exigent circumstances exception to the warrant requirement contemplates the existence of an actual emergency. No evidence of an actual emergency exists on this record.

The exigency exception to the warrant requirement allows the police to

---

[7] *United States v Place*, 462 US 696, 706; 103 S Ct 2637; 77 L Ed 2d 110 (1983), involved whether the Fourth Amendment permits law enforcement authorities to temporarily detain a traveler's luggage so that it can be exposed to a trained narcotics detection dog. The Court held that "when an officer's observations lead him reasonably to believe that a traveler is carrying luggage that contains narcotics, the principles of *Terry* and its progeny would permit the officer to detain the luggage briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope." *Id*.

enter a dwelling without a warrant if the officers possess probable cause to believe that a crime was recently committed on the premises, and probable cause to believe that the premises contain evidence or perpetrators of the suspected crime. The police must further establish the existence of an actual emergency on the basis of specific and objective facts indicating that immediate action is necessary to (1) prevent the imminent destruction of evidence, (2) protect the police officers or others, or (3) prevent the escape of a suspect. [*In re Forfeiture of $176,598*, 443 Mich 261, 271; 505 NW2d 201 (1993).]

When the police arrived at the trailer park, there were no signs of children or unrest. It was after 10:30 p.m.; the park appeared dark and quiet. If any children had been in danger when the manager called the police, the danger was over. The crime—a minor misdemeanor—was also complete. See *Welsh v Wisconsin*, 466 US 740, 750; 104 S Ct 2091; 80 L Ed 2d 732 (1984) ("Our hesitation in finding exigent circumstances, especially when warrantless arrests in the home are at issue, is particularly appropriate when the underlying offense for which there is probable cause to arrest is relatively minor. . . . When the government's interest is only to arrest for a minor offense, that presumption of unreasonableness is difficult to rebut, and the government usually should be allowed to make such arrests only with a warrant issued upon probable cause by a neutral and detached magistrate.").

The mere fact that children lived in the trailer park was not enough to have supported a search warrant for the trailer or an arrest warrant for its occupants. The police were investigating a misdemeanor involving the possession of a firearm. That a firearm might have been located within the trailer, standing alone, did not give rise to an emergency.

IV

Because they did not have a warrant, the police could not enter the trailer. Nor were they constitutionally authorized to constructively enter the trailer by ordering the occupants outside. The arrest of Trapp that followed violated the Fourth Amendment because it was the product of an illegal constructive entry and because the police could not have arrested Trapp for the misdemeanor offense of brandishing a firearm. Trapp's resistance to his arrest was justified under Michigan common law, requiring us to reverse the circuit court and to vacate Trapp's conviction for resisting and obstructing an officer.

We reverse Trapp's resisting and obstructing conviction and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Jane M. Beckering

-14-